**UNITED STATES of America,**
**Appellee–Cross–Appellant,**

v.

**Peter GOTTI, Defendant–Appellant–**
**Cross–Appellee,**

**Anthony Ciccone, also known as Sonny, Richard Bondi, Richard G. Gotti, Defendants–Appellants,**

"inducing" or "encouraging" the fiduciary breach to occur. *See Sharp Int'l Corp. v. State*

Primo Cassarino, Jerome Brancato, Peter Piacenti, Anna Eylenkrig, Thomas Lisi, Carmine Malara, Jerome Orsino, Frank Scollo, Vincent Nasso, Anthony Pansini, Jules R. Nasso, Salvatore Cannata, Defendants.

Docket Nos. 04–2746–CR(L) 04–2960–CR(XAP), 04–4217–CR(CON) 04–4842–CR(CON), 04–5071–CR(CON), 06–0726–CR(CON).

United States Court of Appeals, Second Circuit.

Argued: April 7, 2006.

Decided: July 12, 2006.

*Street Bank & Trust Co. (In re Sharp Int'l Corp),* 302 B.R. 760, 774–75 (E.D.N.Y.2003).

Katya Jestin, David M. Bitkower, Assistant United States Attorneys, Brooklyn, NY, for Roslynn R. Mauskopf, United States Attorney, Eastern District of New York (David C. James, Assistant United States Attorney, Daniel Silver, Special Assistant United States Attorney, of counsel) for the United States of America.

Joseph A. Bondy, Law Offices of Joseph A. Bondy, New York, NY, for Defendant–Appellant–Cross–Appellee Peter Gotti.

Robert A. Culp, New York, NY, George L. Santangelo, Law Office of George L. Santangelo, New York, NY, for Defendant–Appellant Anthony Ciccone.

Richard Medina, New York, NY, for Defendant–Appellant Richard Bondi.

Harry C. Batchelder, New York, NY, for Defendant–Appellant Richard G. Gotti (on submission).

Before FEINBERG and KATZMANN, Circuit Judges, and LYNCH, District Judge.*

KATZMANN, Circuit Judge.

This case raises an issue of first impression for this Court: the scope of the Supreme Court's holding in *Scheidler v. National Org. for Women, Inc.*, 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003) *("Scheidler II")*,[1] in which the Supreme Court tightened the requirements for finding that a defendant has committed extortion under the Hobbs Act, 18 U.S.C. § 1951. On appeal, the defendants-appellants—Peter Gotti, Richard G. Gotti, Anthony ("Sonny") Ciccone, and Richard Bondi—argue that *Scheidler II* invalidates all of the Hobbs Act counts in this case that were premised on the extortion of intangible property rights. We hold, however, that *Scheidler II* did not invalidate the challenged extortion counts at issue in this case, because *Scheidler II*—far from holding that a Hobbs Act extortion could not be premised on the extortion of intangible property rights—simply clarified that for Hobbs Act liability to attach, there must be a showing that the defendant did not merely seek to deprive the victim of the property right in question, but also sought to obtain that right for himself. That standard, which can be satisfied regardless of whether the property right at issue is tangible or intangible, has been met by each of the Hobbs Act counts at issue here. We also reject the numerous other challenges brought by the defendants-appellants to their convictions. Finally, with regard to the defendants-appellants' sentences, we remand Ciccone's and Bondi's cases for resentencing pursuant to *United States v. Fagans*, 406 F.3d 138 (2d Cir.2005), and we remand Peter Gotti's case for consideration of resentencing pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005).[2] We also reject the

---

1. This decision is frequently abbreviated as *"Scheidler II,"* because it represented the case's second journey up to the Supreme Court. The case's first visit to the Supreme Court—*National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994)—is generally referred to as *"Scheidler I."* A recent ruling by the Supreme Court on yet another issue in the case, *Scheidler v. Nat'l Org. for Women, Inc.*, —— U.S. ——, 126 S.Ct. 1264, 164 L.Ed.2d 10 (Feb. 28, 2006), is known as *"Scheidler III."* For purposes of clarity, we employ these abbreviations in this opinion.

2. Richard G. Gotti's appeal was previously severed from this appeal, and his case was remanded to the district court for consideration of resentencing pursuant to *Crosby*. The district court declined to resentence, and Richard G. Gotti then moved to reconsolidate his appeal with the instant appeal so that he could join in the arguments of the other defendants-appellants to the extent that they benefitted him. Accordingly, we assume that Richard G. Gotti joins in those of the defendants-appellants' challenges to their convictions that are applicable to his own convictions. Given that we ultimately reject all of those challenges for the reasons set forth *infra*, and that the district court has already considered whether to resentence him pursuant to *Crosby*, there is no need for a further remand of Richard G. Gotti's case.

argument advanced in the government's cross-appeal that the district court erred when, in sentencing Peter Gotti under the then-mandatory Sentencing Guidelines, it declined to impose a four-level leadership role enhancement upon him despite its finding that he had served as acting boss of the Gambino Organized Crime Family of La Cosa Nostra (the "Gambino Family").

## I. BACKGROUND: THE INDICTMENT, TRIAL, VERDICTS, AND SENTENCES

### A. The Indictment

The 68–count indictment in this case centered on the corrupt influence of the Gambino Family over certain labor unions, businesses, and individuals operating at the piers in Brooklyn and Staten Island. The indictment was brought against seventeen Gambino Family members and associates, including the four defendants-appellants here: (1) Peter Gotti, described in the indictment as the acting boss of the Gambino Family; (2) Ciccone, described as a Gambino Family captain; (3) Richard G. Gotti, described as a "made member" of the Gambino Family; and (4) Bondi, described as a Gambino Family associate.[3] The four defendants-appellants all went to trial, along with three other defendants (Primo Cassarino, Richard V. Gotti, and Jerome Brancato, all of whom were described as "made members" of the Gambino Family), while the remaining ten defendants entered guilty pleas.[4]

The first two counts of the indictment were racketeering and racketeering conspiracy counts brought under 18 U.S.C. §§ 1962(c) and (d). These two counts en-compassed, as predicate acts, the substantive allegations that were then also set forth as separate offenses in Counts 3–68.

For purposes of this appeal, the counts of which the defendants-appellants were ultimately convicted can be divided, on the basis of general subject matter, into fourteen categories. Those categories are as follows: (1) the International Longshoremen's Association, AFL–CIO ("ILA") Counts (RICO Predicate Act 1; Counts 3–7); (2) the Management–International Longshoremen's Association Managed Health Care Trust Fund ("MILA") Counts (RICO Predicate Act 2; Counts 8–13); (3) the Local 1 Checkers chapter of the ILA ("Local 1") Counts (RICO Predicate Act 3; Counts 14–18); (4) the Local 1814 chapter of the ILA ("Local 1814") Counts (RICO Predicate Act 4; Counts 19–23); (5) the Howland Hook Container Terminal ("Howland Hook") Counts (RICO Predicate Act 5; Counts 24–25); (6) the Frank Molfetta ("Molfetta") Counts (RICO Predicate Act 6; Counts 26–27); (7) the Money Laundering Counts (RICO Predicate Acts 7–21; Counts 28–46); (8) the Tommy Ragucci ("Ragucci") Counts (RICO Predicate Act 23; Counts 49–50); (9) the Leonardo Zinna ("Zinna") Count (RICO Predicate Act 24; Count 51); (10) the Nicola Marinelli ("Marinelli") Counts (RICO Predicate Act 25; Counts 52–53); (11) the Eduard Alayev ("Alayev") Counts (RICO Predicate Act 26; Counts 54–57); (12) the Steven Seagal ("Seagal") Counts (RICO Predicate Act 27; Counts 58–59); (13) the Gambling Counts (RICO Predicate Acts 31–32; Counts 66–67) and (14) the Witness Tampering Count (RICO Predicate Act 33; Count 68).

---

**3.** For a brief discussion of the meaning of those terms, *see infra* page 309.

**4.** Those ten defendants, certain of whom figure in the factual recitation below, were Peter Piacenti, Anna Eylenkrig, Thomas Lisi, Carmine Malara, Jerome Orsino, Jr., Frank Scollo, Vincent Nasso, Anthony Pansini, Julius R. ("Jules") Nasso, and Salvatore Cannata.

## B. The Trial

Below, we summarize—in the light most favorable to the government, given the defendants-appellants' convictions—the evidence adduced at trial as to each category of counts with respect to the applicable defendants-appellants.

### 1. The ILA Counts

The gravamen of the ILA Counts, Indictment ¶¶ 98–109, was that certain members and associates of the Gambino Family, including defendant-appellant Ciccone, had exercised control over the affairs of the union, first by using force to determine "who filled various International Executive Officer and other ILA positions" in order to "ensure that organized crime associates would be placed in these positions," and then by directing the activities of those office-holders. *Id.* ¶ 100. These activities gave rise to counts of both extortion and fraud.

With regard to extortion, the indictment alleged that the defendants had wrongfully obtained the following property of ILA union members: "(1) ILA labor union positions, money paid as wages and employee benefits, and other economic benefits that such ILA union members would have obtained but for the defendants' corrupt influence over such union; (2) the right of ILA union members to free speech and democratic participation in the affairs of their labor organization as guaranteed by [Sections 411 and 481 of the Labor–Management Reporting Disclosure Act ('LMRDA'), 29 U.S.C. § 401 *et seq.*]; and (3) the right of ILA union members to have the officers, agents, delegates, employees and other representatives of their labor organization manage the money, property and financial affairs of the organization in accordance with [Section 501(a) of the LMRDA]." *Id.* ¶ 99.

As to fraud, the indictment stated that the defendants had defrauded the ILA and its members out of (1) "ILA labor union positions, money paid as wages and employee benefits, and other economic benefits that such ILA union members would have obtained but for the defendants' corrupt influence over such union" and (2) their right to the honest services of their elected officials and other ILA delegates, employees, agents, and representatives. *Id.* ¶ 104.

At trial, the government adduced substantial evidence in support of the ILA charges. George Barone—a member of the Genovese Organized Crime Family of La Cosa Nostra (the "Genovese Family")—testified that there had been a long-held understanding between the Gambino Family and the Genovese Family concerning the ILA's activities, whereby the Gambino Family "would take care of Staten Island and Brooklyn" and the Genovese Family "would take care of New York and New Jersey." Trial Tr. ("Tr.") 721–22, 727. Barone stated that in the late 1970s, Ciccone became the Gambino representative in charge of the waterfront for Staten Island and Brooklyn, and served as a vice president of the ILA, with the local ILA union officials essentially under his control. Tr. 735–37. Barone himself went to jail from 1983 to 1990, and after being released from jail, again became involved in the Genovese Family's waterfront activities. Tr. 739, 743. At that point, Barone learned that Ciccone was still controlling the waterfront activities in the area, and still possessed influence over the ILA local union officials' activities. Tr. 755.

Additionally, Frank Scollo—former president of Local 1814, an ILA chapter in Brooklyn—testified that "Mr. Ciccone would tell me on many occasions what to do, what not to do." Tr. 1337, 1341–42. Scollo explained that he feared losing his

job as president if he contradicted Ciccone's orders. Tr. 1371. He stated his predecessor, Frank Lonardo, had similarly taken instructions from Ciccone. Tr. 1362–63. Scollo further testified that he kept his relationship with Ciccone secret from all of the other union members. Tr. 1411.

Scollo also specifically testified that prior to the July 2000 ILA convention in Lake Tahoe (which Scollo was to attend as a delegate), Ciccone gave him instructions as to which individuals should be elected to various ILA leadership positions. Tr. 1396. Scollo stated that he was only partially able to carry out these instructions, and that he immediately conveyed all of the developments to Ciccone because "Sonny wanted to know whatever we did; he wanted to be firsthand; he wanted to know about it." Tr. 1398–1400. Scollo explained that Ciccone "didn't want to lose any positions from the Brooklyn side, and as a result, we lost one spot that was [a] concern of his and ours." Tr. 1401. The government also introduced wiretap evidence of the reports that Scollo made to Ciccone (through Cassarino as an intermediary). Gov't Exh. TR–63.

Moreover, Scollo testified that after the ILA convention, a particular Local 1814 delegate named Phil Scala was upset that he had not obtained the leadership position that he wanted, and thus essentially refused to do any more work. Tr. 1448. Scollo, as a result, was very unhappy with Scala's performance and wanted to terminate him. Tr. 1449. However, Scollo did not feel that he had the authority to terminate Scala without Ciccone's approval, because "Sonny always told us … it's the big decisions that we should have to confer with him first." Tr. 1450. In a wiretapped April 18, 2001 conversation between Scollo and Ciccone, Scollo asked, "Can I fire him if I have to?" Gov't Exh.

TR–87. Ciccone responded, "Know what you do … don't pay him for vacation, and tell him, 'Let me tell you something, I was told to tell you already that next time you fuck up like this and you leave me hanging like this, I'm gonna fire you'…. And let him go where the fuck he wants to go." *Id.* Scollo followed these instructions and Scala later resigned. Tr. 1455. Scollo then sought Ciccone's approval to appoint someone else in his place. Tr. 1456.

## 2. The MILA Counts

The MILA Counts related to a scheme of the Gambino and Genovese Families to use their control over MILA (the ILA's national health plan) to ensure that a particular company called GPP/VIP—which was partially owned by Gambino Family associate Vincent Nasso, and which paid substantial kickbacks—was awarded MILA's lucrative pharmaceutical services contract. Indictment ¶¶ 110–113. Ciccone was the only defendant-appellant named in these counts.

At trial, the government adduced evidence of the MILA scheme from several sources. David Tolan—the management co-chairman of MILA since 1997—testified that MILA had been established in early 1997 as a national health plan for all ILA members, and that its Board of Trustees included eighteen management-side trustees and eighteen union-side trustees. Tr. 1079, 1082. In 1997, the MILA trustees decided to include a prescription drug benefit for the members and, to that end, requested proposals from twenty-two pharmaceutical benefit providers. Tr. 1088. All twenty-two companies responded with bids; MILA's outside consultants then produced a list of the top five contenders. Tr. 1088–89. A company called GPP ranked number five in that list, while a company called Express Scripts ranked first. Tr. 1089. Nolan recommended that

GPP (which he believed lacked sufficient financial resources) be eliminated from the list, and that MILA engage Express Scripts. Tr. 1092. The union trustees, however, did not agree with that recommendation, and wanted to enter into an arrangement with GPP. Tr. 1093, 1097–98. The trustees eventually reached an agreement whereby everything below the Virginia border would be managed by Express Scripts, and everything above the Virginia border would be managed by GPP, which had since become part of a larger entity called GPP/VIP. Tr. 1099–1101. The principals of GPP/VIP were Joel Grodman and co-defendant Vincent Nasso. Tr. 1101.

Tolan further testified that after Express Scripts refused to allow an audit that the MILA trustees wanted, MILA began using GPP/VIP exclusively, both north and south of the Virginia border. Tr. 1104–05. Tolan stated that he did not consider GPP/VIP cost-effective, because it was more expensive than other service providers. Tr. 1108. In June of 2001, GPP/VIP requested a half-million dollar annual fee increase, at which point Tolan decided to have the MILA consultants initiate a new round of bidding for the contract. Tr. 1110–13. After the bids came in, GPP/VIP came in second place; in first place was Advance PCS, a pharmaceutical benefit provider whose bid was $4.5 million cheaper than that submitted by GPP/VIP. Tr. 1113–14. Although all the trustees then initially agreed to award the contract to Advance PCS, the union trustees subsequently changed their position and sought to impose two conditions on Advance PCS. Tr. 1114, 1120. Advance PCS agreed to the conditions, but the union trustees still refused to support it, and brought a motion to continue using GPP/VIP. Tr. 1123–25. At that point, the management trustees submitted the matter to binding arbitration, and the arbitrator ultimately ruled in favor of Advance PCS. Tr. 1126–27. Thus, GPP/VIP ultimately held the lucrative pharmaceutical services contract from approximately 1997 to 2001.

The government also adduced evidence that helped to explain why certain ILA trustees had been such strong supporters of GPP/VIP, notwithstanding its higher rates: Ciccone had so ordered. Barone testified that Vincent Nasso was a Gambino Family associate who paid kickbacks to Ciccone out of the contract proceeds. Tr. 760–61. Moreover, Scollo—who, after becoming the President of Local 1814 in August of 2000, became a union-side MILA trustee—specifically testified that he was informed that "Sonny [Ciccone] was interested in [Vincent] Nasso, keeping the GPP in place." Tr. 1412–13. He stated that "Sonny himself told me to keep him abreast of it." Tr. 1413. Scollo further testified that when Advance PCS emerged as a strong challenger in 2001, Cassarino instructed Ciccone, "make sure you do all you can to help [GPP]." Tr. 1419. Scollo responded, "I'll do the best I can, but I think it's too far gone." Tr. 1419–20. Scollo testified that he did not reveal Ciccone's connection with Nasso to any of the other MILA trustees or members. Tr. 1431.

The government also presented wiretap evidence indicating the connection between Nasso and Ciccone, as well as the kickbacks that were being paid from Nasso to Ciccone. For example, in a March 26, 2001 wiretapped conversation among Ciccone, Cassarino, and Nasso, the three men discussed the fact that the MILA March payment had just come in. Gov't Exh. TR–176. Ciccone asked Nasso, "When am I going to see you? I gotta, I'm gonna lay it out." *Id.* (As discussed in further detail *infra*, this was apparently a reference to Ciccone's need for the money in order to make his monthly tribute payment to Pe-

ter Gotti, the acting boss.) On Wednesday, April 18, 2001, Ciccone and Nasso spoke again about the MILA contract. Nasso noted that "the Jew [Joel Grodman, co-principal of GPP/VIP] wants to raise the rate." Gov't Exh. TR–178N. Ciccone responded, "Tell him to go fuck himself. Tell him you do what I tell you to do." *Id.* Ciccone added, "I'm calling the shots over here, not you. And tell him, the day you don't like it, I got another guy to replace you. You're only here on account of me. Fuck him." *Id.* Nasso agreed, stating, "All right. That's what I'm gonna say today." *Id.* Ciccone also asked about receiving his check, to which Nasso responded, "The Jew's gotta send me the money." *Id.* Ciccone asked, "But the Jew got the money?" *Id.* Nasso replied, "No, not yet, not yet.... I gotta know when it comes in." *Id.* Ciccone said, "So tell me about it, I'm laying the fucking thing out too ... [the] last two months, last two times." *Id.*

### 3. The Local 1 Counts

The gravamen of the Local 1 Counts, Indictment ¶¶ 124–137, was that certain defendants, including defendants-appellants Ciccone and Bondi, had conspired and attempted to extort and defraud the Local 1 Chapter of the ILA, particularly by trying to exercise control over two Local 1 officials: Steve Knott (the president) and Louis Saccenti (an elected Local 1 delegate). Specifically, the indictment alleged that the defendants had sought to extort the Local 1 members' property interests in "(1) Local 1 labor union positions, money paid as wages and employee benefits, and other economic benefits that such Local 1 union members would have obtained but for the defendants' corrupt influence over such union; (2) the right of Local 1 union members to free speech and democratic participation in the affairs of their labor organization as guaranteed by [Sections 411 and 481 of the LMRDA, 29

U.S.C. § 401 *et seq.*]; and (3) the right of Local 1 union members to have the officers, agents, delegates, employees and other representatives of their labor organization manage the money, property and financial affairs of the organization in accordance with [Section 501(a) of the LMRDA]." *Id.* ¶ 125. The indictment further alleged that the defendants had sought to defraud Local 1 and its members out of (1) "Local 1 labor union positions, money paid as wages and employee benefits, and other economic benefits that such Local 1 union members would have obtained but for the defendants' scheme and artifice to defraud" and (2) their right to the honest services of their elected officials and other Local 1 delegates, employees, agents, and representatives. *Id.* ¶ 130.

At trial, Scollo testified that while he was President of Local 1814, he had several conflicts with Saccenti, because Saccenti—on behalf of Local 1—would sometimes take actions that "were detrimental to the Brooklyn side of the waterfront, my local [Local 1814]." Tr. 1432. When this occurred, Scollo would "call up Primo [Cassarino] and say 'that guy's breaking chops again,' and he would bring it to Sonny [Ciccone]." *Id.* For example, on one occasion during the summer of 2000, Scollo was upset that Saccenti was going to fill a temporarily vacant shop steward position with someone named Doyle. Tr. 1433. Scollo explained that he wanted someone else to fill that position. *Id.* Accordingly, he reported the situation to Cassarino, hoping that Cassarino would tell Ciccone and that Ciccone would "reach out for Louie [Saccenti] not to make that change." Tr. 1433–44. Cassarino, in turn, told Scollo to tell "Stevie" [Knott] "not to make any move until [Ciccone] speaks to [Saccenti]." Tr. 1441. Scollo, however, was unable to reach Knott. *Id.*

Scollo testified that the friction between him and Saccenti continued, as Saccenti attempted to make certain changes at the Howland Hook Container Terminal in Staten Island. Tr. 1444–45. Scollo did not like these changes because he believed they would "slow things down" on the Local 1814 side. Tr. 1445. Thus, in a February 26, 2001 wiretapped conversation between Scollo and Cassarino, Scollo said that he had told "Augie [Decrescenzo, the Local 1 stop steward] no changes till we get notified. That's Sonny's [Ciccone's] orders." Gov. Exh. TR–77. In a March 8, 2001 conversation between Scollo and Cassarino, Scollo reported, "Augie called me. . . . [H]e was all disturbed from Howland Hook. . . . Louie [Saccenti] told Augie this afternoon that he spoke to you and everything was taken care of." Gov't Exh. TR–78. Scollo stated that Saccenti was a "liar" for having falsely implied that everything was resolved. *Id.* Cassarino instructed, "[T]ell Louie, 'Lou, what are you doin', you're supposed to see me before you do anything.' " *Id.*

The tension between Scollo and Saccenti continued to worsen, as evidenced by a June 27, 2001 wiretapped conversation between Scollo and Cassarino, in which Scollo reported that Saccenti was telling everyone "all bets are off." Gov't Exh. TR–79. Cassarino responded, "I don't understand this guy. . . . Who the fuck is givin' this guy authority to do this?" *Id.* Scollo agreed: "Something's gotta be done with Louie." *Id.* Cassarino reiterated, "He's outta control. . . . Who the fuck's he think he is?" *Id.* Later that day, in another wiretapped conversation, Ciccone instructed Cassarino to take "Richie" [Bondi] with him that night and to "[s]top by" Saccenti's house, "ring his bell," and "[s]ay, you know what? You'd better stop it. . . . You'd bet-

ter stop. . . . Otherwise, you know what's gonna happen here?" Gov't Exh. TR–81. At trial, an investigator for the New York State Attorney General's organized crime task force testified that on that evening, he saw Cassarino and Bondi drive up to Saccenti's home, exit their car, walk toward the entrance, wait there, and then drive away. Tr. 3230–3235.[5]

At trial, Scollo acknowledged that as a Local 1814 official, he did not have any authority over these Local 1 officials, but testified that he—through the help he received from Cassarino and Ciccone—was nonetheless sometimes successful in influencing Saccenti's activities with respect to Local 1. Tr. 1447–48.

#### 4. The Local 1814 Counts

These counts alleged that certain defendants, including Ciccone, had—principally through their control over Scollo, the Local 1814 President—conspired and schemed to defraud members of Local 1814 out of (1) "Local 1814 labor union positions, money paid as wages and employee benefits, and other economic benefits that such Local 1814 union members would have obtained but for the defendants' scheme and artifice to defraud" and (2) their right to the honest services of their elected officials and other Local 1814 delegates, employees, agents, and representatives. Indictment ¶¶ 138–151. The government adduced significant evidence in support of these charges, as described above: namely, the testimony and wiretaps illustrating in detail that Scollo, unbeknownst to the Local 1814 members whom he purportedly represented, had taken orders from Ciccone as to Local 1814 activities, and had not made significant Local 1814 decisions without first obtaining Ciccone's approval.

---

**5.** In the transcript, the date is transcribed as January 27, 2001, rather than June 27, 2001. Tr. 3231. We assume that this is a transcription error.

### 5. The Howland Hook Counts

The gravamen of these counts was that certain defendants, including defendant-appellant Ciccone, had extorted cash payments from Carmine Ragucci, the then-owner of Howland Hook Container Terminal, a shipping terminal in Staten Island. *Id.* ¶¶ 152–155.

At trial, Scollo testified that in late 1996 (before he became president of Local 1814), Ciccone told him that Ragucci was going to start giving him envelopes for transmission back to Ciccone. Tr. 1379. Scollo said that he did "not really" want to be involved in bringing the envelopes from Ragucci to Ciccone. *Id.* Nonetheless, about eight or nine months later, Ragucci began periodically giving Scollo envelopes for Ciccone. Tr. 1380–81. Scollo testified that he would give the envelopes either directly to Ciccone, or (at Ciccone's instructions) to someone else who would then pass the envelope on to Ciccone. Tr. 1381–82. Scollo once assisted Ragucci in putting approximately $8,900 in cash in an envelope for transmission to Ciccone. Tr. 1383.

Scollo testified that he was supposed to pick up the envelopes from Ragucci quarterly, but that Ragucci was very often late with the payments. Tr. 1384. When Ragucci was late, Scollo would report to Ciccone that Ragucci did not have the money, at which point Ciccone would tell him to "make sure that guy does the right thing," and "make sure you go back and make sure you get it." Tr. 1384, 1392. Scollo testified that Ciccone would be "a little pissed off" by late payments and that he, in turn, would communicate Ciccone's displeasure to Ragucci. Tr. 1392.

Scollo further stated that he believed that the transmissions were illegal, explaining, "The fact that we were doing it in these crazy places, and it got worse as time went by, I knew it was not the proper thing to do. I just did it." Tr. 1386. He also testified about the surreptitious nature of the transmissions: "We tried to use decoded ways.... By that I mean, we would use various code words—you got 'that thing'?" Tr. 1388. He explained that they wanted to ensure that if someone were listening to the conversation, its meaning would not be easily understood. Tr. 1389.

Additionally, both Scollo and Carmine Ragucci's brother, Tommy, indicated that Ciccone had no legitimate reason to collect payments from Ragucci, by testifying that to their knowledge, Ciccone had not loaned Ragucci money, nor was he an investor in Howland Hook. Tr. 1744–45, 1897.

### 6. The Molfetta Counts

These counts alleged that certain defendants, including defendant-appellant Ciccone, had extorted Frank Molfetta, the owner of a trucking company. Indictment ¶¶ 156–59. The events leading up to this extortion began in 1994, when Molfetta—the owner of a trucking company named Bridgeside Drayadge—entered into a written contract with Carmine Ragucci, pursuant to which he paid Ragucci $150,000 for certain exclusive rights to operate the trucking business at Howland Hook. Tr. 1785. Molfetta was supposed to pay Ragucci an additional $100,000 once he had earned back the initial $150,000. *Id.* In approximately 1996, however, Ragucci breached the contract by giving some of the Howland Hook trucking work to another company. Tr. 1789. Molfetta, who had not yet even earned back the initial $150,000, concluded that he did not owe Ragucci the additional $100,000, although he still continued providing trucking services at Howland Hook. Tr. 1789–92.

Approximately three years later—in late 1999 or early 2000—Ragucci told Molfetta

that Ciccone wanted to see him. Tr. 1792. At a meeting at the Unicorn Diner on Staten Island, Ciccone told Molfetta not to pay Ragucci any more money, and to start paying him instead. Tr. 1794–97. Molfetta testified that Ciccone asked for $2500 per month, but that he told Ciccone that he could only pay $1500, and that he would start making these payments the following month. Tr. 1802. Ciccone responded, "No, you start for last month." Tr. 1803.

Molfetta therefore started making monthly cash payments to Ciccone. When asked at the grand jury proceeding why he made these payments, Molfetta stated, "Why? Fear," adding, "I'm afraid right now.... [Y]ou kind of know people in that position have the power to do things to people if they don't do what they're told to do."

At the trial, however, Molfetta changed his account and stated that he had paid Ciccone not out of fear, but rather because Ciccone got him out of his contract with Ragucci. Tr. 1807. The government therefore introduced Molfetta's grand jury testimony as a prior inconsistent statement that could be admitted for its truth. Tr. 1808. When confronted with that earlier inconsistent testimony, Molfetta testified that he had simply told the government what it wanted to hear during the grand jury proceedings, because he was scared that he would be put in jail. Tr. 1809–1811. He acknowledged, however, that the government had threatened him with jail only if he gave false testimony. Tr. 1814.[6]

### 7. The Money Laundering Counts

These counts related to the payment of illicit proceeds by lower-ranking members to the highest-ranking members of the Gambino Family as "tributes." Peter Got-

ti, Ciccone, and Richard G. Gotti were the defendants-appellants named in these counts. Indictment ¶¶ 162–63.

At trial, the government presented evidence about the general structure of organized crime families such as the Gambino Family, and about the practice of making tribute payments. FBI Agent Gregory Hagarty testified as an expert witness on organized crime, and explained that in the typical organized crime family in New York City, the "boss" is at the top of the hierarchy, with the "underboss" and the "consigliere" right below him, collectively making up the "administration." Tr. 232, 236. Agent Hagarty stated that when the boss is imprisoned or otherwise incapacitated, the family has "an acting boss who speaks with the same authority as the boss." Tr. 240. He explained that below the administration, there are typically a "number of captains," each of whom runs "a crew of soldiers." Tr. 236. He stated that "associates" were ranked below soldiers, sitting at the lowest level of the pyramid. *Id.* Agent Hagarty further explained that the overall purpose of an organized crime family is to generate money from illegal activities for the "administration." Tr. 238. He referred to this practice as "kicking up," explaining that "[y]ou take money from your illegal activities and kick it up to your boss. 'Tribute' is another word they use." Tr. 239.

With regard to the Gambino Family, Agent Hagarty testified that Paul Castellano had served as boss of the family until 1985, at which point John J. Gotti became its boss. Tr. 248. Agent Hagarty further stated that John J. Gotti's son, John A. Gotti (also known as "Junior"), took over as acting boss in 1992 and served in that

---

**6.** Molfetta subsequently was charged with perjury for his trial testimony, pled guilty, and was sentenced to six months' imprisonment.

position until 1999. Tr. 446–48. The government further presented evidence that in 1999 (when John A. Gotti was imprisoned), his uncle Peter Gotti—brother of John J. Gotti—became acting boss of the Gambino Family. Specifically, the government introduced wiretaps of conversations between Gene Gotti (the incarcerated brother of John J. Gotti and Peter Gotti) and various visitors to the FCI McKean prison. In one such conversation on May 13, 1999, Gene Gotti stated, "My brother Pete's making the books." Gov't Exh. HTR–5. Agent Hagarty testified that this was a reference to "making new members," which could be done only by someone in the administration. Tr. 2442. In another such conversation, which occurred on January 13, 2000, Gene Gotti stated that Peter Gotti was "just there because there's nobody else to put there." Gov't Exh. HTR–10

In the wiretapped conversations, Gene also referred to tribute payments that were being made to Peter Gotti. For example, when one visitor commented to Gene on November 18, 1999, "Two thousand. A thousand each youse are getting … every month," Gene responded, "Where am I getting it? My wife ain't getting it…. Who's taking it now?" Gov't Exh. HTR–6. The visitor replied, "Your brother gets it. Your brother has it." *Id.* Subsequently, Gene commented, "They're all taking money. My brother Pete and all the rest of them." Gov't Exh. HTR–7. The visitor stated, "Gene, you've been getting it for the last three years." *Id.* Gene said, "I never seen it the last three years…. [I]f you did give it to somebody, please get it back. For three years, that's a hundred and fifty thousand dollars. No, twelve, twenty-four, it's thirty-six thousand. Please get it and send it right to my house." *Id.* The visitor responded, "I'll tell your brother." *Id.* Gene said, "And from now on don't give it to my

brother…. I don't want that. The situation is he gets it—but I haven't touched it. He was my acting capo." *Id.* Two months later, Gene instructed another visitor, "As soon as you see Peter just tell him, here. Here's eight for you, here's four for Genie." Gov't Exh. HTR–10.

Moreover, the government presented evidence indicating that the tributes were paid in cash to Peter Gotti on a monthly basis—typically the third or fourth Tuesday of each month, and transmitted from Jerome Brancato to Peter Gotti—and that these payments came from extortion, fraud, and gambling activities. For example, on the third Tuesday of April 2000 (April 18, 2000) Ciccone, Cassarino, and Brancato discussed arrangements for payments to someone they referred to only as "him." Gov't Exh. TR–154. Brancato stated, "I was out there the other day with him, I went over the whole thing with him. I'll bring it to him." *Id.* Cassarino responded, "Do it the way he told ya…. [J]ust take what ya gotta take … and give [him] everything else." *Id.* Similarly, on May 22, 2000 (which was the day before the fourth Tuesday of May 2000, *i.e.,* May 23, 2000), Ciccone told Cassarino, "[t]hat guy tomorrow…. [T]ell that guy, if he, he, he's a little confused and he needs to see me, I'll see him anytime he wants." Gov't Exh. TR–156. "What guy?" Cassarino asked. *Id.* "You know what I'm talkin' about, the guy that Jerry [Brancato's] gotta see tomorrow," answered Ciccone. *Id.* Cassarino then said, "Oh, oh, oh, oh, yeah, okay. Alright." *Id.*

Similarly, on October 15, 2000—which was two days before the third Tuesday of October 2000 (October 17, 2000)—Cassarino told Bondi to go see "Eddie" [Alayev] and to "[d]o everything," stating, "I gotta make that deadline by tomorrow, and I'm not gonna make it." Gov't Exh. TR–162. At trial, Agent Hagarty testified that on

October 17, 2000, Brancato met Peter Gotti near 159th Avenue and 96th Street in Howard Beach. Tr. 2356.

Once again, on November 25, 2000—which was three days before the fourth Tuesday in November (November 28, 2000)—Cassarino told Bondi, "[Y]ou're gonna have to get the whole thing from Jerome [Orsino] anyway and drop it off at Jerry [Brancato's] house." Gov Exh. TR–165. On the payment date—November 28, 2000—Bondi told Cassarino that Brancato was waiting for him at the club, "because he had to go over there today ... you know what I'm saying?" Gov't Exh. TR–166. At trial, Agent Hagarty testified that on that same day, Brancato was seen going out to Howard Beach, and subsequently meeting Peter Gotti near 159th Avenue and 96th Street there. Tr. 2357–59.

Surveillance agents also observed Brancato meeting Peter Gotti in the same area on January 23, 2001 (the fourth Tuesday of the month). Special Agent James I. Folsom III of the FBI testified that he was on a surveillance assignment in Howard Beach that day. Tr.2095–96. He stated that he observed Peter Gotti's vehicle come into the area, and that this vehicle then "circled the block several times—different blocks." Tr.2097–98. He testified that Brancato then arrived, carrying a "white plastic shopping bag." Tr.2098. Brancato then got into Peter Gotti's vehicle, which drove away. Tr.2097. Agent Hagarty similarly testified that Brancato was seen meeting Peter Gotti at the same Howard Beach location on February 27, 2000 (the fourth Tuesday of the month). Tr. 2361.

Wiretapped conversations from March and April 2001 indicated that the monthly tribute payments were also being derived, at least in part, from the MILA kickbacks. For example, on March 26, 2001, which was the day before the last Tuesday in March, Cassarino told Ciccone that Brancato was "gonna see him [Peter Gotti] Wednesday, not tomorrow." Gov't Exh. TR–176 Ciccone responded that Brancato was "comin' up short ... so I'll lay out the.... [W]hat[,] I'm gonna send Jerry [Brancato] there with nothin' [?]" Id. Later in the conversation, Nasso—who was also on the phone—stated that the MILA March payment had just come in that day. Ciccone asked, "When am I going to see you? I gotta, I'm gonna lay it out," i.e., provide Brancato with money for the tribute payment to Peter Gotti. Id. At trial, Agent Hagarty testified that on Wednesday, March 28, 2001, he observed Brancato meeting with Peter Gotti at the same Howard Beach location. Tr. 2365.

On Wednesday, April 18, 2001, Ciccone and Nasso spoke again about the money from the MILA contract. In this conversation, Nasso stated that "the Jew [Joel Grodman] gotta send me the money.... I gotta know when it comes in." Ciccone said, "So tell me about it, I'm laying the fucking thing out too ... [the] last two months, last two times." Gov't Exh. TR–178N. At trial, Special Agent Robert Rogers of the FBI stated that on Tuesday, April 24, 2001, he observed Brancato meeting Peter Gotti in the same vicinity in Howard Beach. Tr. 2168.

On April 25, 2001, Brancato was arrested in another case, after which time the payment mechanism changed. Tr. 2411. Whereas previously Brancato had been making the payments directly to Peter Gotti in Howard Beach, now Cassarino began making the payments either to Richard V. Gotti (Peter Gotti's brother) or defendant-appellant Richard G. Gotti (Richard V. Gotti's son and Peter Gotti's nephew) in Brooklyn. On Monday, June 25, 2001, for example, Cassarino noted to Ciccone, "We gotta, got that appointment Thursday ... for the month." Gov't Exh.

TR–182. At the trial, Special Agent Rogers testified that on Thursday, June 28, 2001, he followed Cassarino—who was carrying a blue plastic bag—to the Sheepshead Bay neighborhood of Brooklyn, where Cassarino then entered Maria's Restaurant. Tr. 2200–01. Richard G. Gotti's car was seen in the parking lot of the restaurant. Tr. 2202–03.

On Wednesday, September 26, 2001, Cassarino indicated to Ciccone that he had initially thought he had "that number," *i.e.,* the full tribute payment, but that "I don't have it." Gov't Exh. TR–189. The following day, Ciccone indicated that he would advance Cassarino the money: "[H]ere's what I'm gonna.... I'm gonna give you [money] that's from this guy. Gonna go see him tomorrow, alright. So this way, if I have to lay it out [in advance], I'm gonna see him tomorrow morning." Gov't Exh. TR–189A. The "him" to whom Ciccone was referring was apparently Frank Molfetta—who, as described above, was being extorted for monthly payments by Ciccone—given that the following morning (September 28, 2001), Captain James McGowan of the Waterfront Commission of New York Harbor observed a meeting between Ciccone and Molfetta at a diner on Staten Island, during which Molfetta passed an envelope across the table to Ciccone, stating "it's all there, hundreds." Tr. 1863, 1870.

On November 29, 2001, law enforcement officers executed search warrants on Cassarino and Richard G. Gotti after observing a meeting between them at Maria's Restaurant in Brooklyn. They recovered $12,000 in cash from Richard G. Gotti's pants pockets. Tr. 2315–2316. Cassarino later reported to Ciccone that "[r]emember what happened to Jerry [Brancato] last time [*i.e.,* being apprehended by law enforcement]? ... Just happened to me." Gov't Exh. TR–202. Ciccone noted, "we should change it," an apparent reference to the existing tribute payment mechanism. *Id.* Cassarino agreed: "Definitely, without a doubt." *Id.* Ciccone reiterated, "Yeah. Fuck that. I don't wanna go to jail." *Id.* Cassarino reflected, "They [the officers] gave me his card, that fucking [Captain] McGowan, that prick." *Id.*

### 8. The Tommy Ragucci Counts

These counts alleged that certain defendants, including defendant-appellant Ciccone, had conspired and unsuccessfully attempted to extort Tommy Ragucci (referred to in the indictment as "John Doe 1"), an employee at Howland Hook (and the brother of Carmine Ragucci), by ordering him to resign from his position there so that it could be filled by Bobby Anastasia, who was related to a Gambino Family member. Indictment ¶¶ 168–171.

In support of these charges, the government introduced testimony from Scollo, who stated that in the summer of 2001, Ciccone (either directly or through Cassarino) ordered him to tell Tommy Ragucci to leave his position. Tr. 1516. Scollo explained that Ciccone wanted to remove Tommy Ragucci from the position so that Bobby Anastasia could be placed there. Tr. 1518. Scollo further testified that he carried out these orders, but that Tommy Ragucci said that he would not resign. Tr. 1516–17.

Tommy Ragucci, in turn, testified that in approximately August of 2001, Scollo approached him and stated "that his boss wanted me to step down." Tr.1901. He asked Scollo who his boss was; Scollo responded, "Sonny." *Id.* Tommy understood that this meant "Sonny Ciccone." Tr.1902. He stated that upon receiving this order, "I felt very—I would say I felt intimidated." Tr.1903. He subsequently had a "sit-down" with Scollo, at which point he asked whether he could talk directly to

Ciccone. *Id.* Scollo responded, "No way, can't happen." Tr.1904. Tommy Ragucci then told Scollo that he was not willing to step down. *Id.* Scollo "was very upset and he left." *Id.*

The government also presented a July 19, 2001 wiretapped conversation in which Ciccone told Cassarino that he wanted the "Bobby A" [Bobby Anastasia] task to be done "as soon as possible," Gov't Exh. TR–118, as well as a July 26, 2001 wiretapped conversation, in which Scollo reported to Ciccone: "I grabbed Tommy yesterday and I told him, listen to me." Gov Exh. TR–119. Ciccone responded, "Tell him I don't want him there. Tell him I don't want him there.... Say you're only there because I gave your brother [Carmine] a fucking chance. That's it. That's it. Now you're out." Scollo replied, "I told him as soon as possible." *Id.* Ciccone reiterated, "And not the end of the summer. As soon as possible, maybe within the next thirty days."

Scollo subsequently reported, in an August 6, 2001 wiretapped conversation with Cassarino, that "I spoke to Tommy. He said he don't feel like he wants to step down." Gov't Exh. TR–120. When Ciccone later learned that Tommy Ragucci was still in his position, he remarked to Cassarino and Bondi, "We gonna do, we gotta get rid of this fuckin' guy." Gov't Exh. TR–121. Evidently, however, the matter was ultimately dropped, because as of the trial, Tommy Ragucci was still working at the Howland Hook terminal. Tr. 1897.

#### 9. The Zinna Count

This count alleged that certain defendants, including defendant-appellant Ciccone, had conspired to extort $5,000 from Leonardo Zinna (referred to in the indictment as "John Doe 2"), after they learned that Zinna had charged two people $3,000 each for waterfront jobs. Indictment ¶ 173.

The evidence supporting this conspiracy charge was straightforward. At trial, the government introduced into evidence a wiretapped conversation in which Ciccone stated to Cassarino and Scollo, in regard to Zinna, "[G]et a hold of this guy.... He got to bring us five.... 'Cause, you know what, you cocksucker?.... You took six. You gave back three. Now we want five from you." Ciccone reiterated: "Fuck him. Tell him I want five." Gov't Exh. TR–115.

#### 10. The Marinelli Counts

These counts alleged that certain defendants, including defendant-appellant Ciccone, conspired to extort, and did extort, a certain sum of money from Nicola Marinelli (referred to in the indictment as "John Doe 3"). Indictment ¶¶ 174–177.

At trial, the government adduced evidence that after Marinelli sought (at the suggestion of his attorney, Tr. 2765–66) the help of Ciccone and Cassarino in obtaining his workmen's compensation payments, they extorted him for a portion of these proceeds. Specifically, wiretap evidence demonstrated that after Marinelli was set to receive his payments, Cassarino ordered Marinelli's son, Vito, to bring money to him. In the wiretapped conversation, Cassarino asked Vito whether everything had been "straightened out" with his father. Gov't Exh. TR–222. When Vito responded affirmatively, Cassarino responded, "Alright, 'cause you got to come and see me, right?" *Id.* Vito then expressed nervousness (apparently about how much money to bring), stating, "I wanna know what you think is the right thing. Know what I'm saying?" *Id.* Cassarino responded, "I don't know. Whatever you think. That's what he [Ciccone] told me and then they'll just take it from

there." *Id.* Vito responded, "I, I, I don't want to do the wrong thing." *Id.* Cassarino responded, "[I]f it's wrong, I'll tell ya." Vito said, "we're waiting for the, ah, for the check.... Then we'll come see ya." *Id.*

Vito further testified at trial that he was "afraid to do the wrong thing," and that after he paid Cassarino $5,000, Cassarino informed him that this was insufficient and that the payment needed to be around $20,000 to $25,000. Tr. 2781–86. After Vito informed his father that Cassarino and Ciccone were unsatisfied, the family ultimately paid another $5,000. Tr. 2786–90.

### 11. The Alayev Counts

These counts alleged that certain defendants—including defendants-appellants Ciccone and Bondi—had conspired to extort, and had extorted, the following property interests from Eduard Alayev (referred to in the indictment as "John Doe 4"), the owner of a café in Brooklyn: (1) money; (2) the right to refuse to keep illegal gambling machines at a business; and (3) the right to sell a business free from outside pressure. Indictment ¶¶ 178–185.

At trial, Alayev testified that he and his business partner (his brother) had purchased the café—called Café Roma—in October of 1999 from someone named Rocco Ritorto. Tr. 2478–79.[7] He further testified that about two months after purchasing Café Roma, Cassarino and Bondi (whom Alayev referred to, respectively, as "Primo" and "Richie") came together to tell him that they wanted to install gambling machines at the cafe. Tr. 2488–89. Alayev refused, but Cassarino "responded by saying, 'Whether you want it or not, I'm

going to install the gambling machines.'" Tr. 2488. Cassarino stated that if Alayev would not let him install the machines, Alayev would have to pay him $1,000 each month, adding that "the neighborhood [was] all his territory." *Id.* Alayev wanted to call the authorities, but was "very afraid for [his] family," and thus did not do so. Tr. 2492.

Alayev stated that three gambling machines were subsequently installed in the back room of his restaurant while he was out shopping. Tr. 2492–93. Alayev told Cassarino that he was afraid that if the gambling machines were found, Café Roma would lose its liquor license, to which Cassarino responded, "[Y]ou are not going to be responsible for anything, if any tickets [ ] come, we'd pay your ticket." Tr. 2493. Alayev added that Bondi began coming to Café Roma to collect money from the machines, and would typically give him a portion of the proceeds. Tr. 2495–96.

The police subsequently appeared at Café Roma, broke all of the gambling machines, and arrested Alayev. Tr. 2494. Alayev moved the broken machines down to the basement and told Cassarino that the machines "are not going to be here anymore." Tr. 2498. Someone nonetheless subsequently came to Café Roma to install one or two new gambling machines. Tr. 2502. Alayev did not let the person install the machines. *Id.* Cassarino then called him and said something "to the extent [of] 'whether you want it or not, we're going to install the machines.'" *Id.* People later returned with the machines and stored them in the basement. Tr. 2503. Alayev noted, "[i]t was not really possible to stop them because they were big people

---

7. Evidently, however, legal ownership of the café was never transferred into Alayev's

name. Tr. 2508.

and like I'm really like a small person. I couldn't really stop them." Tr 2503. Alayev then closed the kitchen of the restaurant, "[b]ecause the machines were there and I didn't like the police to come again and see the machines again." *Id.*

In December of 2000, Alayev decided that he wanted to sell Café Roma. Tr. 2498. Cassarino ultimately became closely involved in the details of this sale, telling Alayev that he wanted Café Roma to be sold to someone named Lenny Kogan, and that Alayev "should not sell it to anybody but Lenny." Tr. 2504. He told Alayev that Kogan would pay $40,000 for Café Roma. *Id.* Cassarino ended up taking a portion of that money for himself. Tr. 2512–14.

In addition to Alayev's trial testimony about these events, the government also introduced wiretapped conversations in which Bondi provided Cassarino with information about Alayev (whom they referred to as "Eddie") and the goings-on at Café Roma. Gov't Exh. TR–300; Gov't Exh. TR–313. For example, in one conversation, Bondi complained to Cassarino about Alayev, stating "this cocksucker Eddie ... was telling them he don't want nobody walkin' through his kitchen" (where the gambling machines were located). Gov't Exh. TR–300. Cassarino responded, "so grab the guy Eddie, and tell the guy Eddie, 'who the fuck are you to tell us that thing?'" Bondi said, "I told 'em, I told 'em." *Id.* In other wiretapped conversations, Cassarino reported to Ciccone about the details of the Café Roma sale. Gov't Exh. TR–320; Gov't Exh. TR–324.

### 12. The Seagal Counts

These counts alleged that certain defendants, including defendant-appellant Ciccone, conspired and attempted to extort the film actor Steven Seagal (referred to in the indictment as "John Doe 5"), by trying to obtain money from him and attempting to get him to do business with them. Indictment ¶¶ 58–59.

At trial, Steven Seagal testified that he became good friends with Jules Nasso (the brother of Vincent Nasso of GPP/VIP) in the late 1980s. Tr. 2928–29. At Jules Nasso's request, Seagal brought him into the movie business, and the two men formed a production company called Seagal–Nasso. Tr. 2930. In the mid–1990s, however, Seagal grew to believe that Jules Nasso's personality had changed. Tr. 2931–32. He decided that he did not want to work with Jules Nasso any longer and severed the business relationship in the late 1990s. Tr. 2933–34. According to Seagal, Jules Nasso was unhappy about the end of the relationship, and told Seagal that Seagal owed him approximately one million dollars. Tr. 2935. Seagal's accountants and attorneys, however, disagreed, telling Seagal that Jules Nasso owed him money, rather than vice versa. Tr. 2935.

In October of 2000, during the making of the movie "Exit Wounds" in Toronto, Seagal received a visit from Jules Nasso's brother, Vincent Nasso, along with Ciccone and Cassarino. Tr. 2937–39. At that meeting, according to Seagal, Ciccone told him that he thought it would be "really nice if I worked with Jules again and that Jules' mother also wanted us to work together." Tr. 2939. When Seagal indicated that he was not sure whether that would be possible, Ciccone became silent, making Seagal feel uncomfortable. Tr. 2939–2940.

Seagal testified that he later met with Ciccone in New York, after having received many calls from Vincent Nasso telling him that Ciccone "wanted to see me." Tr. 2942. When Seagal arrived at the Nassos' mother's house for the meeting, he

was informed that the meeting had been moved somewhere else, which made Seagal feel "increasingly uncomfortable." Tr. 2943. Seagal then got into a car (accompanied by his assistant) and was taken to a restaurant, where Ciccone, Cassarino, Jules Nasso, and Vincent Nasso were sitting at an upstairs table. Tr. 2944. Ciccone began talking to Seagal about "monies that I owed Jules ... he then went into the fact that he wanted me to work with Jules and that was important to him and I again told him that I'm trying." Tr. 2945–46. At this point, Ciccone ordered him to "look at me when you are talking." Tr. 2946. Ciccone then said: "Look, we're proud people and you work with Jules ... Jules is going to get a little and the pot will be split up.... We'll take a little." *Id.* The meeting ended with Seagal stating that he "would try to work with Jules." Tr. 2947. Seagal testified that as he walked out of the restaurant, Jules started walking with him and said "something to the effect of 'You know, it's a good thing you said this and didn't say that because if you would have said the wrong thing, they were going to kill you.'" Tr. 2948.

Seagal further testified that on the morning of the March 2001 premiere of "Exit Wounds," Ciccone—accompanied by Jules and Vincent Nasso, Cassarino, and another man—showed up at his home, at which point Ciccone claimed that Seagal owed them $3 million, stating "I told you what I want and I don't think you are getting it." Tr. 2956. Ultimately, Seagal paid Jules Nasso between $500,000 and $700,000, which he testified at trial arose from a previous "stock issue where he had put some of his own money up to buy stock with me." Tr. 2957. Seagal also contacted a former acquaintance of his, who was then in prison in New Jersey, and "explained to him this misunderstanding that was going on and I asked him if he could speak with these people on my behalf, be

sort of a peacemaker and see if there is a way that this all could be settled in a businesslike manner." Tr. 2960–62. After that, Jules and Vincent Nasso came to Seagal's home and told him to "forget about Sonny, forget about us, forget about everything, good-bye." Tr. 2962. Jules subsequently filed a $60 million civil lawsuit against Seagal. Tr. 2962–63.

The government also introduced a wiretapped conversation in which Ciccone and Jules Nasso discussed their interactions with Steven Seagal, and in which Ciccone stated, "We were gonna tell [Seagal] that every movie he makes ... we want a hundred and fifty thousand," and told Jules, "I want you to talk to him.... Don't treat him with kid gloves." Gov't Exh. TR–257.

### 13. The Gambling Counts

These counts alleged that certain defendants, including Ciccone and Bondi, had run an illegal bookmaking business as well as an illegal joker-poker gambling operation. Indictment ¶¶ 202–205. The bookmaking charge rested on the allegation that Ciccone, Bondi, and other Gambino Family co-defendants had run the New York operation of the Costa Rica-based Pelican Sports bookmaking business from approximately September 18, 2000 to December 2001. The joker-poker charge rested on the allegation that several defendants, including Ciccone and Bondi, had operated a large-scale gambling business that employed joker-poker electronic gambling devices, including those placed at Café Roma.

#### a. *The Bookmaking Charges*

At trial, with regard to the bookmaking charges, the government adduced evidence that numerous defendants—including defendants-appellants Bondi and Ciccone as

well as defendants Cassarino, Brancato, Malara, Orsino, and Lisi—had collectively run the New York operation of the Pelican Sports bookmaking business. This evidence included various wiretapped conversations that indicated the respective roles of Bondi and Ciccone in the operation. As to Bondi, the wiretaps indicated that he participated in paying winning bettors, collecting from losing bettors, and "freezing" bettors who owed money. Indeed, in one conversation between Bondi and Cassarino, Bondi reported that they had to freeze a particular bettor, stating, "He don't have it till Wednesday.... So he's froze." Gov't Exh. TR–515. Cassarino responded, "[W]hat is he, what is he up, up or minus? ... That's the important part before you freeze him.... If he's up, you don't want to freeze him." *Id.* Bondi responded, "Alright, well let me call, I call him right, then I call you back." *Id.* Approximately six minutes later, Bondi called back to report that the bettor was "minus twenty-two," to which Cassarino replied, "Good. Freeze it." Gov't Exh. TR–516. Similarly, in a conversation between co-defendants Cassarino and Lisi, the men discussed the need to talk to "Richie" [Bondi] about a bettor who wanted to "straighten out now, so he could play tonight." Gov't Exh. TR–508.

The wiretap evidence also indicated that Ciccone acted as the ultimate supervisor of the bookmaking business, with Cassarino reporting directly to him. In several wiretapped conversations between Cassarino and Ciccone, Cassarino provided an update as to the various business developments.

On October 1, 2001, Cassarino reported to Ciccone, "[W]e had a decent fuckin' week." Gov't Exh. TR–426. Ciccone asked, "How many guys are bettin' [?]" *Id.* Cassarino responded: "About ah ... thirty ... thirty guys ... but see one guy we got on commission ... one guy, in other words, one, one guy is on a forty percent sheet ... the kid Jerome [Orsino] ... we get all his players ... instead of givin' him fifty-fifty sheet we're givin' him forty percent." *Id.* Ciccone replied, "Now you're gonna give him thirty." *Id.* Cassarino replied, "Cut him down to thirty, yeah ... come down thirty ... he'll do us a favor ... don't worry about it." [8] *Id.*

The government also introduced wiretapped conversations between a number of co-defendants who had participated in the operation. For example, in one wiretapped conversation between Brancato and Malara, Brancato referred to a particular player, "Soldier," with whom he had experienced "a little problem." Gov't Exh. TR–555. In a subsequent conversation, Malara told Brancato, "Soldier's gettin', well, you know, I, I got him for the week plus twenty-eight-ten.... And the other guy.... I believe you're collecting like fourteen and change, turning seventy-one-o-seven." Gov't Exh. TR–563. Brancato then stated, "What I'm gonna do, I'll straighten the whole thing out with you." *Id.*

In addition, the government introduced Detective Martin's testimony that documents with betting figures had been seized from the residences of Cassarino and Lisi.

---

**8.** At trial, New York City Police Department Detective Kevin Martin (an expert on the subject of illegal gambling) explained that this meant that "Jerome Orsino ha[d] a 40 percent sheet, meaning someone has a sheet arrangement, arrangement with bettors on—under his sheet. He has to have some type of arrangement with the bookmaker. Either you [are] submitting 50–50 sheet, you are submitting half the winnings, half the losings. They all do go from there 40 percent or 30 percent or quarter sheet, 25 percent sheet." Tr. 3436. When asked what the difference was between a 40 percent sheet and a 30 percent sheet, Detective Martin explained that it referred to "how much either gives out or adds in." Tr. 3437.

Tr. 3452–56. Detective Martin explained that the documents from Cassarino's residence listed the "weekly figures of each person" in the stable of bettors that was managed by the co-defendants, and that the figures were broken down by "the account number, the name, each day of the week, how much they're up or down and their [betting] cap at the end." Tr. 3453. He stated that the documents seized from Lisi's residence included figures for three particular bettors managed by Lisi. Tr. 3454–55. One bettor appears to have been up by $5800 for the week; another was listed as being up by $3380. Tr. 3456. Detective Martin also testified that documents removed from Bondi's residence included gambling records. Tr. 3456–57.

### b. *The Joker–Poker Charges*

On the joker-poker charges, the government presented evidence at trial that Ciccone, Bondi, and other co-defendants had run a gambling operation using "joker-poker" electronic gambling machines at a number of locations, including Café Roma. In addition to Alayev's testimony about the defendants' having forced him to install gambling machines at Café Roma, the government also introduced the testimony of various law enforcement officials. For example, Detective Paul Grzegorski of the New York City Police Department testified that on August 23, 2000, he observed Bondi entering Frank & Sal's Hair Stylists in Brooklyn, going over to a gambling device located therein, opening the device with a key, and removing the currency from the device. Tr. 3236–39. When asked to describe the device, Detective Grzegorski stated, "You put money into it and you bet credits and you play the credits and you get basically what is called extended play. If you win, you get additional credits and you can get paid off on those credits." Tr. 3238. Detective Grzegorski further stated that after observing

this, he stopped Bondi as he was exiting the shop and placed him under arrest. Tr. 3239. He then searched Bondi and found on his person a list of locations with gambling devices. Tr. 3240–3253. Detective Martin provided additional testimony as to how the gambling devices in question worked: "You insert a sum of U.S. currency into the machine, you receive credits for your currency, and you play those credits, and during that course of the game you play the credits until you win a game, if it is cherries, bells, plums, whatever it may be." Tr. 3508.

### 14. The Witness Tampering Count

This count alleged that certain defendants, including defendant-appellant Ciccone, had tampered with a witness in this case before it went to trial. Indictment ¶ 206. That witness was Bondi's stepson, Anthony Frazetta, whom the government had served with a grand jury subpoena.

At trial, the government adduced wiretap evidence indicating that in a February 11, 2002 conversation between Ciccone, Bondi, and co-defendant Primo Cassarino, Ciccone said the following about Frazetta: "This fucking Joe, I don't know where the fuck his mentality is. If, if, if you start to answer and they can ask you everything and anything ... Every fucking thing has got nine fucking questions. You know what I'm saying? ... He goes, so how'd you get this job? It was my father, my father. Who is your father's friend? Sonny Ciccone.... He's taking the [F]ifth. I don't want to hear it." Gov't Exh. TR–461. When Cassarino indicated that Frazetta had apparently provided some information already, Ciccone responded, "yeah, but why, but he opened up a Pandora's Box. 'Cause they ask you one question, they ask you another." *Id.*

On February 18, 2002, Frazetta's lawyer advised the government by letter that Frazetta would assert his Fifth Amendment privilege against self-incrimination. On February 20, 2002, when Frazetta was scheduled to appear before the grand jury, Cassarino commented to Ciccone, "[T]hat kid is going there today." Gov't Exh. TR–462. The next day, Ciccone asked Cassarino, "how'd Richie's kid do?" Gov't Exh. TR–463. Cassarino reported that there had been some uncertainty as to whether the court would accept Frazetta's letter asserting the privilege, and that apparently Frazetta would have to return in person. *Id.* Cassarino noted that he had told Bondi that Frazetta "shoulda went there with the lawyer and fucking hand in the letter. If they accept it, they accept it; they don't accept it, you're there." *Id.* Ciccone replied, "That was stupid, what the lawyer did. He shoulda made him go there anyway." *Id.* Cassarino reiterated: "Just go in there, do what you gotta do, and get the fuck out. . . . That's all, you take the [F]ifth and that's it. Goodbye." *Id.* Ciccone agreed: "That's the end of it." *Id.*

## C. The Verdicts

### 1. Peter Gotti

Peter Gotti was convicted of Racketeering (Count 1), Racketeering Conspiracy (Count 2), Money Laundering Conspiracy (Count 28), and on the Money Laundering Counts as to 10/17/00 (Count 31), 11/28/00 (Count 32), 1/23/01 (Count 35), 2/27/00 (Count 37), 3/28/01 (Count 38), and 4/24/01 (Count 40).

He was acquitted of Money Laundering as to 9/19/00 (Counts 30) and 12/26/00 (Count 34).

### 2. Richard G. Gotti

Richard G. Gotti was convicted of Racketeering (Count 1), Racketeering Conspiracy (Count 2), Money Laundering Conspiracy (Count 28), and on the Money Laundering Counts as to 6/27/01 (Count 42), 8/31/01 (Count 43), 10/25/01 (Count 45), and 11/29/01 (Count 46).

### 3. Anthony Ciccone

Ciccone was convicted of Racketeering (Count 1), Racketeering Conspiracy (Count 2), Conspiracy to Extort ILA (Count 3), Extortion of the ILA (Count 4), Scheme to Defraud the Membership of the ILA (Counts 6 and 7), Conspiracy to Extort MILA (Count 8), Extortion of MILA (Count 9), Scheme to Defraud MILA as to 9/11/00 (Count 11), Scheme to Defraud MILA as to 9/16/01 (Count 13), Conspiracy to Extort Local 1 (Count 14), Attempted Extortion of Local 1 (Count 15), Scheme to Defraud Local 1 as to 6/30/00 and 6/27/01 (Counts 17 and 18), Scheme to Defraud Local 1814 as to 11/3/00, 2/7/01, 6/17/01, and 8/22/01 (Counts 20–23), Conspiracy to Extort Howland Hook Container Terminal (Count 24), Extortion of Howland Hook Container Terminal (Count 25), Conspiracy to Extort Owner of a Trucking Company (Count 26), Extortion of Owner of a Trucking Company (Count 27), Money Laundering Conspiracy (Count 28), Money Laundering as to multiple dates (Counts 29–35, 37–46), Conspiracy to Extort John Doe 1 (Count 49), Attempt to Extort John Doe 1 (Count 50), Conspiracy to Extort John Doe 2 (Count 51), Conspiracy to Extort John Doe 3 (Count 52), Extortion of John Doe 3 (Count 53), Conspiracy to Extort John Doe 4 (Count 54), Extortion of John Doe 4—Money (Count 55), Extortion of John Doe 4—Right to Refuse to Keep Gambling Machines at a Business (Count 56), Extortion of John Doe 4—Right to Sell a Business (Count 57), Conspiracy to Extort John Doe 5 (Count 58), Attempted Extortion of John Doe 5 (Count 59), Illegal Gambling Business—Joker/Poker (Count 66), Illegal Gambling Business—Sports

Betting Operation (Count 67), and Witness Tampering (Count 68).

He was acquitted as to Scheme to Extort MILA as to 11/14/01 (Count 12), Conspiracy to Extort Relatives of a Prospective Employee (Count 47), Extortion of Relatives of a Prospective Employee (Count 48), Conspiracy to Use Extortionate Means to Collect an Extension of Credit from John Doe 8 (Count 64), and Use of Extortionate Means to Collect an Extension of Credit from John Doe 8 (Count 65).

### 4. Richard Bondi

Bondi was convicted of Racketeering (Count 1), Racketeering Conspiracy (Count 2), Conspiracy to Extort Local 1 (Count 14), Attempted Extortion of Local 1 (Count 15), Scheme to Defraud Local 1 (Counts 17–18), Conspiracy to Extort John Doe 4 (Count 54), Extortion of John Doe 4—Money (Count 55), Extortion of John Doe 4—Right to Refuse to Keep Gambling Machines at a Business (Count 56), Extortion of John Doe 4—Right to Sell a Business (Count 57), Illegal Gambling Business–Joker/Poker (Count 66), and Illegal Gambling Business—Sports Betting Operation (Count 67).

He was acquitted as to Conspiracy to Use Extortionate Means to Collect an Extension of Credit from John Doe 7 (Count 62) and Use of Extortionate Means to Collect an Extension of Credit from John Doe 7 (Count 63).

### D. The Sentences

#### 1. Peter Gotti

Peter Gotti was sentenced to a term of imprisonment of 115 months, less 85 days that he had served in administrative confinement. The district court also imposed an order of forfeiture against Peter Gotti in the amount of $3,749,250.

#### 2. Richard G. Gotti

Richard G. Gotti was sentenced to a term of imprisonment of 33 months. As noted above, his sentence has already been remanded to the district court pursuant to *Crosby;* upon reconsideration, the district court declined to resentence him.

#### 3. Anthony Ciccone

Ciccone was sentenced to a term of imprisonment of 180 months. He also received an order of restitution of $1,601,499 and an order of forfeiture of $1,636,499.

#### 4. Richard Bondi

Bondi was sentenced to a term of imprisonment of 57 months and an order of restitution of $311,894.

## II. CHALLENGES BY THE DEFENDANTS TO THEIR CONVICTIONS

### A. The Defendants' Challenge under *Scheidler v. National Organization for Women, Inc.,* 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003) (*"Scheidler II"*)

The defendants-appellants first argue that numerous extortion counts in the indictment became invalid upon the issuance of *Scheidler II,* which was decided by the Supreme Court on February 26, 2003, just as the trial in this case was concluding. For Ciccone and Bondi, who were charged with and convicted of multiple Hobbs Act extortion counts (both as separate offenses and as RICO predicates, as set forth in detail above), this argument goes to their actual convictions. For Peter Gotti and Richard G. Gotti, this is a sentencing issue: they were not charged with extortion, but the extortion counts included in the indictment were considered by the district judge as relevant uncharged conduct under the

Sentencing Guidelines when imposing their sentences.

It is undisputed that we evaluate the legal issues of whether the indictment properly charged Hobbs Act extortion and whether the district court correctly charged the jury on these counts under a *de novo* standard. In assessing these issues, we begin by discussing *Scheidler I* and analyzing its scope. We then apply our interpretation of *Scheidler II* to each of the challenged extortion counts in this case, and ultimately conclude that each of them can stand.

### 1. The *Scheidler II* Decision

*Scheidler II*, as set forth below, tightened the requirements for finding that a defendant has committed extortion under the Hobbs Act. To appreciate the significance of Scheidler II, it is therefore necessary to begin with the text of the Hobbs Act, upon which the challenged extortion counts here rested. It provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or *extortion or attempts or conspires so to do,* or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (emphasis added). The Hobbs Act further defines "extortion" as

> *the obtaining of property from another,* with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951(b)(2) (emphasis added).

Before *Scheidler II,* this Circuit (and others) had interpreted the phrase "the obtaining of property from another" quite broadly, in two key respects: (1) "property" had been held to encompass intangible as well as tangible property rights; and (2) "obtaining" had been held to encompass cases where the defendant caused a loss of or interference to the victim's property rights, even though the defendant had not actually sought to exercise those property rights for himself or herself. Clear examples of these two propositions can be found in our precedents.

As to the first proposition—namely, the expansive interpretation of "property"—our Circuit's decision in *United States v. Tropiano,* 418 F.2d 1069 (2d Cir.1969), stands as an early landmark case. The *Tropiano* defendants were partners in a garbage collection company who were displeased when a new competitor, Caron Refuse Removal, Inc. ("Caron"), started soliciting business in their vicinity and taking away some of their customers. *Id.* at 1072. They then used threats of violence to force Caron to stop recruiting their customers and to agree not to solicit any business in the area. *Id.* On appeal, this Court upheld the *Tropiano* defendants' Hobbs Act extortion convictions, rejecting their argument that "nothing more than 'the right to do business' in the Milford area was surrendered by Caron and that such a right was not 'property' 'obtained' by the appellants." *Id.* at 1075. We explained:

> The concept of property under the Hobbs Act, as devolved from its legislative history and numerous decisions, is not limited to physical or tangible property or things but includes, in a broad sense, any valuable right considered as a source or element of wealth and does not depend upon a direct benefit being conferred on the person who obtains the property.

Obviously, Caron had a right to solicit business from anyone in any area without any territorial restrictions by the appellants and only by the exercise of such a right could Caron obtain customers whose accounts were admittedly valuable. Some indication of the value of the right to solicit customers appears from the fact that when the [*Tropiano* defendants' company's] accounts were sold for $53,135, [the] agreement [obtained from Caron] not to solicit those customers was valued at an additional $15,000.... Caron's right to solicit accounts in Milford, Connecticut constituted property within the Hobbs Act definition.

*Id.* at 1075–76 (internal citations omitted). More recently, this Circuit similarly held that "[t]he right of the members of a union to democratic participation in a union election is property; that the right is intangible does not divest it of protection under the Hobbs Act," and on that basis, crime families who sought to replace control of the union could be found guilty of conspiracy to commit extortion. *United States v. Bellomo,* 176 F.3d 580, 592–93 (2d Cir. 1999).

As for the second proposition (the expansive interpretation of "obtaining"), in *United States v. Arena,* 180 F.3d 380 (2d Cir.1999), this Court held—in a case involving anti-abortion protestors who tried to shut down a clinic—that the "obtaining" prong of the Hobbs Act's definition of "extortion" was satisfied in cases where an extortionist used violence to force his victim to abandon the property rights in question, even though the extortionist was not seeking to exercise those property rights for himself. The *Arena* Court explained that "where the property in question is the victim's right to conduct a business free from threats of violence and physical harm, a person who has committed or threatened violence or physical

harm in order to induce abandonment of that right has obtained, or attempted to obtain, property within the meaning of the Hobbs Act." *Id.* at 394.

This second proposition was evaluated by the Supreme Court in *Scheidler II,* which implicated facts similar to those in *Arena.* In *Scheidler II,* the defendants were anti-abortion protestors who had attempted to shut down abortion clinics. 537 U.S. at 398, 123 S.Ct. 1057. The plaintiffs argued that these defendants—"by using or threatening to use force, violence, or fear to cause respondents 'to give up' property rights, namely, 'a woman's right to seek medical service from a clinic, the right of the doctors, nurses, or other clinic staff to perform their jobs, and the right of the clinics to provide medical services free from wrongful threats, violence, coercion, and fear' " —had committed extortion under the Hobbs Act. *Id.* at 400–401, 123 S.Ct. 1057. The Seventh Circuit agreed, stating that "the defendants assert that, even if 'property' was involved, the defendants did not 'obtain' that property; they merely forced the plaintiffs to part with it ... [but] this argument is contrary to a long line of precedent in this circuit." *Nat'l Org. for Women, Inc. v. Scheidler,* 267 F.3d 687, 709 (7th Cir.2001).

The Supreme Court reversed. Initially, the Court noted that on appeal, the respondents "had shifted the thrust of their theory" with regard to precisely which property rights had been extorted from them. *Scheidler II,* 537 U.S. at 401, 123 S.Ct. 1057. It stated that although the respondents had argued below that the extorted property rights were those of the women and the clinics to receive and perform medical services, they

now assert that petitioners violated the Hobbs Act by "seeking to get control of the use and disposition of respondents'

property." They argue that because the right to control the use and disposition of an asset is property, petitioners, who interfered with, and in some instances completely disrupted, the ability of the clinics to function, obtained or attempted to obtain respondents' property.

The United States offers a view similar to that of respondents, asserting that "where the property at issue is a business's *intangible* right to exercise exclusive control over the use of its assets, [a] defendant obtained that property by obtaining control over the use of those assets."

*Id.* (internal citations omitted; alteration and emphasis in original).

The Court then concluded that even this revised construction was inconsistent with the Hobbs Act's explicit reference to "obtaining of property from another," 18 U.S.C. § 1951(b)(2). *See id.* at 402, 123 S.Ct. 1057. It stated that

> [w]e need not now trace what are the boundaries of extortion liability under the Hobbs Act, so that liability might be based on obtaining something as intangible as another's right to exercise exclusive control over the use of a party's business assets.... Whatever the outer boundaries may be, the effort to characterize petitioners' actions here as an 'obtaining of property from' respondents is well beyond them.

*Id.* The Court went on to state that the anti-abortion protesters had neither

> pursued nor received something of value from respondents that they could exercise, transfer, or sell. To conclude that such actions constituted extortion would effectively discard the statutory requirement that property must be obtained from another, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion.

*Id.* at 405, 123 S.Ct. 1057 (internal citation and quotation marks omitted).

The Court also explained that such a construction would eliminate the distinction between "extortion and the separate crime of coercion.... The crime of coercion, which more accurately describes the nature of petitioners' actions, involves the use of force or threat of force to restrict another's freedom of action." *Id.* The Court found it telling that in drafting the Hobbs Act, Congress had specifically included extortion as a Hobbs Act violation, while not including coercion. *Id.* at 406–07, 123 S.Ct. 1057. The Court concluded that "[b]ecause ... [the anti-abortion protestors] did not obtain or attempt to obtain property from respondents, ... there was no basis upon which to find that they committed extortion under the Hobbs Act." *Id.* at 409, 123 S.Ct. 1057.

Justice Stevens, the lone dissenter, protested that the *Scheidler II* majority's "murky opinion seems to hold that this phrase ['the obtaining of property from another'] covers nothing more than the acquisition of tangible property," and that "[n]o other federal court has ever construed this statute so narrowly." *Id.* at 412, 123 S.Ct. 1057 (Stevens, *J.*, dissenting). In other words, Justice Stevens argued that *Scheidler II* had struck down not only the second proposition (the expansive definition of "obtaining") but also the first proposition (the expansive definition of "property"). *Id.* at 412–16, 123 S.Ct. 1057.

The majority opinion, however, expressly disclaimed the notion that it swept so broadly. Indeed, in addition to stating that it "need not now trace what are the outer boundaries of extortion liability under the Hobbs Act," such as whether "liability might be based on obtaining something as intangible as another's right to

exercise exclusive control over the use of a party's business assets," the majority explicitly stated that "the dissent is mistaken to suggest that our decision reaches, much less rejects, lower court decisions such as ... *Tropiano* ..., in which the Second Circuit concluded that the intangible right to solicit refuse collection accounts constituted property within the Hobbs Act definition." *Id.* at 402 & n. 6, 123 S.Ct. 1057 (internal quotation marks omitted).

In construing the scope of the *Scheidler II* holding, we are guided by the majority's explicit statement that *Scheidler II* did not even reach, much less reject, our holding in *Tropiano.* Indeed, we believe that the appropriate interpretation of *Scheidler II* must be one that co-exists with *Tropiano,* both as to the "property" and "obtaining" prongs. Thus, as an initial matter, we easily conclude that *Scheidler II* did not overturn *Tropiano's* broad interpretation of the Hobbs Act's reference to "property," nor otherwise suggest that only tangible property rights can be extorted under the Hobbs Act. The *Scheidler II* majority, in going out of its way to emphasize that it was not reaching *Tropiano,* essentially said as much. Indeed, *Scheidler II* consistently emphasized that it was only tightening the "obtaining" requirement of the Hobbs Act, and that in this regard, an important inquiry was whether the defendants had "pursued [or] received something of value from [victims] that they could exercise, transfer, or sell." *Id.* at 405, 123 S.Ct. 1057 (internal quotation marks omitted). In the case of the anti-abortion protestors who sought only to shut down abortion clinics, they had not. Generally speaking, however, intangible property rights—such as, for instance, non-competition or exclusivity agreements—are certainly things of value that are capable of being exercised, transferred, or sold. We therefore read *Scheidler II* as leaving intact this Circuit's prec-

edent that intangible property rights can qualify as extortable property under the Hobbs Act and as simply clarifying that before liability can attach, the defendant must truly have obtained (or, in the case of attempted extortion, sought to obtain) the property right in question.

The more complex question is precisely what, pursuant to *Scheidler II,* it means to "obtain" a property right. The *Scheidler II* Court framed this question as a two-part inquiry that requires both a deprivation and an acquisition of property, explaining that while the anti-abortion protestors in that case "may have deprived or sought to deprive respondents of their alleged property right of exclusive control of their business assets, ... they did not acquire any such property." *Id.* at 404–05, 123 S.Ct. 1057. In further explaining why the anti-abortion protestors could not be viewed as having acquired such property, the Court stated that they had "neither pursued nor received something of value from respondents that they could *exercise, transfer, or sell." Id.* at 405, 123 S.Ct. 1057 (emphasis added) (internal quotation marks omitted).

This explanation, in our view, provides the key to understanding what it means, pursuant to *Scheidler II,* to acquire property and thus to obtain it. We read the Court's emphasis on the possibility of exercising, transferring, or selling the property as a concern with the extortionist's *intent* with respect to the property at issue. The "ultimate goal" of the anti-abortion protestors in *Scheidler II* was merely " 'shutting down' a clinic that performed abortions." *Id.* at 405, 123 S.Ct. 1057. This did not constitute acquisition in the eyes of the *Scheidler II* Court, we believe, because there was no further intended activity on the part of the protestors, and mere interference with the clinics' right to conduct their business, even to the point of getting

them to cease conducting their business altogether, was closer to coercion than extortion. But had the protestors sought to take further action after having deprived the clinics of their right to conduct their business as they wished—by, for example, forcing the clinic staff to provide different types of services, forcing the clinic to turn its operations over to the protestors, or selling the clinic or its property to a third party [9]—we believe that they would have satisfied the *Scheidler II* Court's definition of "obtaining."

Against this backdrop, it becomes clear why the Supreme Court indicated that *Tropiano* remains good law notwithstanding *Scheidler II*. The *Scheidler II* Court characterized the right at issue in *Tropiano* as "the intangible right to solicit refuse collection accounts." *Id.* at 402 n. 6, 123 S.Ct. 1057. Had the *Tropiano* defendants sought merely to get Caron to stop soliciting collection accounts because they believed that the Milford area should be entirely free from any solicitation, *Tropiano* could not stand; like the anti-abortion protestors, the *Tropiano* defendants would have been seeking simply to deprive someone of a right without doing anything affirmative with that right themselves. But unlike the anti-abortion protestors, the *Tropiano* defendants *did* seek to take action with respect to Caron's solicitation rights; they sought to transfer those rights to themselves so that they could continue their own solicitation unimpeded by competition, and thus, in a sense, broaden their own solicitation rights. In other words, the *Tropiano* defendants essentially forced Caron to give them—at no cost—a non-competition agreement, which, according to the *Tropiano* Court, was valued at about $15,000, and they used that non-competition agreement to further their own business activities. *Tropiano*, 418 F.2d at 1076. Their goal was ultimately to enrich themselves, something that could not be accomplished without appropriating to themselves the economic value of Caron's property rights. These actions, unlike those in *Scheidler II*, constituted extortion under the Hobbs Act.

■ Thus, we hold that in evaluating an extortion count's conformity with *Scheidler II*—*i.e.*, whether it adequately alleges the "obtaining of property" for purposes of the Hobbs Act's definition of extortion—the key inquiry is whether the defendant is (1) alleged to have carried out (or, in the case of attempted extortion, attempted to carry out) the deprivation of a property right from another, with (2) the intent to exercise, sell, transfer, or take some other analogous action with respect to that right. A motive ultimately to profit by cashing out the value of the property right will generally serve as powerful evidence that the defendant's goal was to obtain the

9. These three examples illustrate various ways in which an extortion victim's property right might be exercised, transferred, or sold by an extortionist. In the first example, the victim is ordered to exercise his or her rights in accordance with the extortionist's wishes, such that the extortionist is essentially controlling the exercise of those rights. In the second example, the victim is ordered to transfer his or her rights over to the extortionist so that the extortionist can simply exercise those rights himself or herself. (A closely related variant would be where the extortionist orders the victim to transfer the rights to a third party of the extortionist's choosing.) In the third example, the victim's right is sold by the extortionist to a third party of the extortionist's choosing. The precise demarcation between an exercise and a transfer may certainly be subject to debate. Because the critical question is simply whether the defendant sought to exercise, transfer, *or* sell the rights at issue, however, we are less concerned with line-drawing between those terms than with the unifying principle for the "exercise, transfer, or sale" framework: the defendant's intent to do something affirmative with respect to the property right.

right for himself, rather than merely to deprive the victim of that right.

We thus proceed to apply this test to each of the challenged extortion counts.

## 2. The Challenged Extortion Counts

On appeal, the defendants-appellants cite the following counts in the indictment as being invalidated by *Scheidler II:* the ILA-related extortion counts; the Local 1–related extortion counts; the MILA-related extortion counts; the Tommy Ragucci Counts; the Alayev Counts; and the Seagal Counts. They argue that in each of these counts, the allegations support only a charge of coercion, not extortion. Relatedly, they argue that the district court's charge as to each of these counts was inconsistent with *Scheidler II.* We therefore assess each count to determine whether it is consistent with our construction of *Scheidler II,* first looking at how each count was framed in the indictment, and then considering how the district court ultimately described each count to the jury when issuing its charge.

### a. *The Indictment*
#### i. *The ILA and Local 1 Counts*

On both the ILA-related and Local 1–related extortion counts, the indictment alleged that the defendants sought to obtain, and did obtain, the union members' LMRDA rights to free speech and democratic participation in union affairs as well as their LMRDA rights to loyal representation by their officers, agents, and other representatives. It further stated that the defendants sought to exercise those rights themselves, by telling various delegates whom to vote for in certain leadership positions, and by controlling various elected officials' performance of their union duties. We believe that these allegations satisfy our interpretation of *Scheidler II,* because the government charges not only

that the defendants caused the relinquishment of the union members' LMRDA rights, but also that the defendants did so in order to exercise those rights for themselves—indeed, in a way that would profit them financially.

█ We note that the defendants-appellants have also argued that these counts must fail because they could not *legally* exercise the union members' LMRDA rights, and therefore cannot be said to have obtained them. This argument builds upon a recent split that has emerged, post-*Scheidler II,* among various district courts in this Circuit. Three of the four district courts considering this issue— the district court in this case, *see* March 26, 2004 Sentencing Tr. 10–14, along with two other district courts—have concluded that LMRDA rights can constitute extortable property under the Hobbs Act, notwithstanding the fact that LMRDA rights cannot be legally exercised by third parties. *See United States v. Muscarella,* 2004 WL 2186561, at * 6 (S.D.N.Y. Sept.28, 2004); *United States v. Cacace,* 2004 WL 1646760 at * 2–*3 (E.D.N.Y. July 14, 2004). One district court, however, has reached a different view, concluding in a pair of cases that intangible property rights can qualify as extortable property under the Hobbs Act, but only if they can be lawfully exercised, transferred, or sold, and that LMRDA rights therefore do not qualify. *See United States v. Bellomo,* 263 F.Supp.2d 561, 575–576 (E.D.N.Y.2003); *United States v. Coffey,* 361 F.Supp.2d 102, 108–109 (E.D.N.Y.2005).

We agree with the majority of district courts that have concluded that intangible property can qualify as extortable property under the Hobbs Act regardless of whether its exercise, transfer, or sale would be legal. The Supreme Court did not include a "legality" limitation in *Scheidler II.* Moreover, as the government

points out, the *Bellomo/Coffey* approach adopted by one district court gives rise to the untenable implication that one can never "extort," under the Hobbs Act, illegal property (such as narcotics) because such property cannot be legally used, sold, or transferred. In *Bellomo*, the district court tried to distinguish this argument by stating that "[t]he victim's grievance in that hypothetical would surely not be the loss of his right to distribute drugs, but what the extortionist has obtained from him, the drugs." *Bellomo*, 263 F.Supp.2d at 576. It is, however, as illegal to possess tangible drugs as it is to exercise the intangible "right to distribute drugs." The *Bellomo* court thus seems to suggest that its "legality" gloss on *Scheidler II* only applies to intangible property. We see no basis in principle, policy, or the text of *Scheidler II*, however, for holding that tangible property is "obtainable" regardless of whether its use, transfer, or sale is legal, but that intangible property is "obtainable" only if its exercise, transfer, or sale is legal. Nor do we see any basis for imposing a "legality" requirement on the extortion of both tangible and intangible property. Accordingly, we hold that the ILA-related and Local 1–related Hobbs Act extortion counts all survived *Scheidler II*.

### ii. The MILA Counts

Similarly, as to the MILA-related extortion counts, the indictment alleges that the defendants sought to obtain, and did obtain, the MILA participants' and beneficiaries' rights to have the MILA trustees contract with the service provider of prescription drugs of the trustees' choice, and to have MILA trustees and fiduciaries discharge their duties in MILA's best interest. The indictment further asserts that the defendants sought to exercise these rights for themselves by telling the MILA trustees which service provider to support, and thereby ensuring the selection of a Gambino-associated enterprise (GPP/VIP) that would pay kickbacks. Here, too, the allegation is that the defendants exercised the rights in question in order to profit themselves. Thus, the MILA-related Hobbs Act extortion counts satisfy the dictates of *Scheidler II*.

### iii. The Tommy Ragucci Counts

As to the Tommy Ragucci Counts, the relevant portion of the indictment alleges that the defendants attempted to obtain "money and the right of John Doe 1 [Tommy Ragucci] to be an employee of Howland Hook Container Terminal." Indictment ¶¶ 169, 171. In its brief, the government similarly characterizes the extorted property from Tommy Ragucci as his "salary and right to be employed at Howland Hook." We note that while Tommy Ragucci was presumably an at-will employee with no guaranteed right to continued employment at Howland Hook, he surely had the right to be employed there for as long as he sought the job and his employer would have him. The defendants unquestionably sought to deprive him of that right, and of its attendant salary, when they ordered him to quit. The defendants also sought to take affirmative steps with respect to those rights of employment and salary, insofar as their ultimate goal was to transfer those rights to their own preferred candidate. Thus, for the same reason that we believe *Tropiano* survives *Scheidler II*, we conclude that the Tommy Ragucci Counts similarly survive: in both cases, the defendants tried to force their victim to relinquish a property right so that they could transfer that right either to themselves (as in *Tropiano*) or to a third party of their choice (as in the Tommy Ragucci Counts).

### iv. The Alayev Counts

The Alayev Counts also state a claim for Hobbs Act extortion under our interpreta-

tion of *Scheidler II*. Here, in relevant part, the indictment alleges that the defendants obtained Alayev's intangible property rights to make various business decisions (such as whether to keep illegal gambling machines on the premises) free from outside pressure. As the government aptly states in its brief, "[t]he defendants did not seek merely to 'shut down' Alayev's business but essentially made themselves his silent partners and exercised his rights to their own advantage." Because here the allegation is that the defendants sought to exercise for themselves Alayev's rights in a manner that would profit them, the Alayev Counts survive *Scheidler II*.

### v. *The Seagal Counts*

Finally, the Seagal Counts also satisfy the *Scheidler II* standard. Here, it is alleged that the defendants sought to exercise for themselves Seagal's right to make his own business decisions, by threatening him with possible violence unless he worked with Jules Nasso again. Thus, here the defendants sought to exercise for themselves Seagal's intangible right to decide with whom to work, in order to secure profit for themselves. This constitutes Hobbs Act extortion under *Scheidler II*.

### b. *The Jury Charge*

■ We similarly conclude that the jury was properly instructed as to the elements of extortion under the Hobbs Act.

The charge that the district court ultimately issued to the jury on March 5, 2003 (mere days after *Scheidler II* was decided) was, in relevant part, as follows:

> The term crime in the Hobbs Act includes not only money and other tangible things of value but also includes any intangible right considered as a source or component of income or wealth.... [Y]ou should find the defendant guilty of extortion provided the government

has proven that as a consequence thereof the defendant obtained money or something else of value from the victims that the defendant could exercise and transfer or sell.

> In other words, merely interfering and depriving someone of property is insufficient to constitute extortion. You have to be [sic] the obtaining of money or something else of value from the victims that the defendant could exercise, transfer or sell as well.

Tr. 4836, 4839.

In addition to setting forth that definition of "obtaining," the district court also defined the relevant property implicated in each of the various extortion counts. For example, as to the ILA-related extortion counts, the district court identified the property at issue as consisting

> not only of union positions, money paid as wages and employee benefits and other economic benefits, but also certain intangible rights of ILA members that are guaranteed to them by the Labor Management Reporting Disclosure Act, which we refer to as the LMRDA.... The LMRDA is a federal statute that guarantees and protects the rights of employees who are members of labor organizations or unions.... The LMRDA guarantees the rights of union members to fully and freely participate in the internal affairs and governance of their union, to run for union office, if they choose, to assemble and express their views and opinions about union affairs, to support and campaign on behalf of candidates of their choice and to vote in union elections, all without being subject to retaliation, threats or other punishment in the exercise of those rights. The LMRDA also guarantees the right of union members to have their organization's money, property and financial affairs of their labor organiza-

tions managed in accordance with the loyal and responsible representation of the union's officers, agents, shop stewards and other representatives solely for the benefit of the union and its members and not on behalf of any party whose interests conflict with those of the union and its members.

Tr. 4837–38.

As to the MILA-related extortion counts, the district court identified the property at issue as including

> One, money and other economic benefits that MILA and its participants and beneficiaries would have obtained but for the defendants' corrupt influence over MILA.

> Two, the right of MILA and its participants and beneficiaries to have the MILA trustees contract with the service provider of prescription pharmaceuticals of the trustees' choice; and

> Three, the right of MILA and its participants and beneficiaries to have the MILA's trustees and fiduciaries discharge their duties with respect to MILA solely in the interest of MILA and its participants and beneficiaries and not on behalf of a party whose interests are adverse to the interests of MILA and its participants and beneficiaries. . . . These latter rights are guaranteed by certain statutes, including the Employee Retirement Income Security Act of 1974, which we call ERISA.

Tr. 4849–51.

On the Local 1–related extortion counts, the district court stated that they implicated the same property interests as had been implicated by the ILA-related extortion counts. Tr. 4858.

As to the Tommy Ragucci Counts, the district court stated that the property at issue was "the right of Tommy Ragucci to

be an employee of Howland Hook Terminal." Tr. 4892.

As to the Alayev-related extortion counts, the district court stated that the property at issue consisted of money or the right to conduct a business free from outside pressure, including the right to refuse to keep the illegal gambling machines at a business and the right to sell the business free from outside pressure. Tr. 4894.

The district court added that, in regard to the rights to refuse to keep illegal gambling machines at a business and to sell the business,

> merely interfering with or depriving someone of those property rights is insufficient to constitute extortion. More is required. Before you can find the defendant guilty of extortion under these sub parts, you must find the government has proven that as a result of wrongfully inducing the victim to part with the property right identified in those sub parts, the defendant obtained money as [*sic*] something else of value from the victim that the defendant could exercise, transfer or sell. So, in other words, it is not enough just to discourage somebody or coerce somebody from not selling his business, you have to get something because of that type of activity.

Tr. 4895–96.

Finally, as to the Seagal-related extortion counts, the district court stated that the property at issue was "money and the right to make business decisions free from outside pressure." Tr. 4897.

We believe that the district court's charge to the jury as to each of these counts was generally consistent with *Scheidler II* and with the analysis that we have set forth above. The defendants-appellants argue that the district court's

charge was erroneous because, at several times during the lengthy charge, it "called ... to mind" concepts "inconsistent with the *Scheidler* holding," such as coercion. In particular, they point out that when discussing the ILA-related counts, the district court stated that "I further instruct you that you may find that a defendant induced labor union members to surrender property by the wrongful, actual or threatened use of force, violence or fear if the defendant threatened or coerced such members or their agents or representatives against their will in a manner that caused the members to refrain from exercising their rights under the LMRDA." Tr. 4838–39. The defendants-appellants neglect to mention, however, that in the very next sentence, the district court went on to state that "if you do so find, then you should find the defendant guilty of extortion *provided the government has proven that as a consequence thereof the defendant obtained money or something else of value from the victims that the defendant could exercise and transfer or sell.*" Tr. 4839 (emphasis added). Thus, the district court clearly and expressly tied its instruction on the ILA extortion counts back to the *Scheidler II* standard.

Similarly, the defendants-appellants point out that when charging the jury on the MILA-related extortion counts, the district court told the jurors that "if you conclude that the government has proven that a defendant used such coercion to induce a MILA trustee or another person who exercised discretionary authority or control in regard to MILA's assets in the transaction to select Vincent Nasso's firm as a service provider without regard to the interest of the plan's participants and beneficiaries, but, rather, in the interest of Vincent Nasso and others acting on his behalf, then you may find such defendant wrongfully induced the obtaining of intangible rights of the MILA participants and

beneficiaries." Tr. 4854. The defendants-appellants suggest that this language "practically told the jury to find on the basis of coercion rather than obtaining property by extortion." This characterization is simply incorrect. Contrary to the defendants-appellants' assertion, here the district court was instructing the jurors that to find that the defendants had wrongfully obtained the intangible rights of the MILA participants and beneficiaries, they had to find not only that the defendants had caused the relinquishing of these rights, but that the defendants had exercised those rights for themselves, *i.e.,* by ensuring the selection of Gambino associate Vincent Nasso's company, GPP/VIP, as a service provider. Even this excerpted portion was, therefore, entirely consistent with the *Scheidler II* standard. It is also worth noting that a mere two sentences before this MILA-specific discussion, the district court had expressly reiterated that "merely interfering with or depriving someone of property is insufficient to constitute extortion. You need the other branch of this, that the defendants obtained money or something else of value from the victims that the defendants could exercise, transfer, or sell." Tr. 4853–54.

■ In short, the record makes clear that the district court consistently emphasized to the jury—both as a general matter and in its discussion of the particular extortion counts—the "obtaining" requirement as set forth in *Scheidler II*. And where a jury is repeatedly and correctly instructed, in the language of the controlling Supreme Court decision, on the elements required for conviction, a defendant cannot claim prejudicial error. *See United States v. Coyne,* 4 F.3d 100, 114 (2d Cir. 1993). We therefore reject all of the defendants-appellants' *Scheidler II*-based challenges to their extortion convictions.

## B. The Defendants–Appellants' Sufficiency of the Evidence Challenges

The defendants-appellants also raise various challenges to the sufficiency of the evidence supporting their convictions of the Local 1 Counts, the Local 1814 Counts, the Howland Hook Counts, the Molfetta Counts, the Money Laundering Counts, the Tommy Ragucci Counts, the Zinna Count, the Marinelli Counts, the Alayev Counts, the Seagal Counts, the Gambling Counts, and the Witness Tampering Count. We discuss each of these challenges below. As an initial matter, we note that the same standard of review applies to all of these challenges: the defendants-appellants are subject to the "heavy burden" of demonstrating that no jury could have found guilt beyond a reasonable doubt based on the reasonably drawn inferences from the evidence, which this Court views in the light most favorable to the government. *See, e.g., United States v. Locascio*, 6 F.3d 924, 944 (2d Cir.1993). We also note that, to the extent that one defendant-appellant asserts a sufficiency-of-the evidence argument that is also relevant to the case of another defendant-appellant, we assume that the other defendant-appellant joins in that argument, given that each of them have so indicated in their submissions to this Court.

### 1. The Local 1 Counts [Ciccone, Bondi]

As described in detail above, the Local 1 counts rested on the argument that the defendants, including defendants-appellants Ciccone and Bondi, had attempted, schemed, and conspired to exercise control over Local 1 officials Saccenti and Knott. On appeal, both Ciccone and Bondi argue that there was insufficient evidence to support their fraud convictions as to Local 1, and Bondi also argues that there was in-sufficient evidence to support his conviction for extortion of Local 1. We first analyze whether there was sufficient evidence on the Local 1 fraud counts, and then move to an assessment of the Local 1 extortion counts.

### a. The Local 1 Fraud Counts

It is undisputed that the Local 1 fraud counts—which alleged a conspiracy and scheme to defraud Local 1—sounded in an "honest services wire fraud" theory. As this Court has previously explained, the general elements of wire fraud under 18 U.S.C. § 1343 are (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) use of the wires to further the scheme. *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir.2004). The specific type of wire fraud at issue here— "honest services wire fraud"—arises under 18 U.S.C. § 1346, which this Circuit has interpreted to "clearly prohibit[ ] a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer." *United States v. Rybicki*, 354 F.3d 124, 126–27 (2d Cir.2003) (en banc); *see also id.* at 147 (stating that a conviction requires a showing of "(1) a scheme or artifice to defraud; (2) for the purpose of depriving another of the intangible right of honest services . . .; (3) where the misrepresentations (or omissions) made by the defendants are material in that they have the natural tendency to influence or are capable of influencing the employer to change its behavior; and (4) use of the mails or

wires in furtherance of the scheme"); 18 U.S.C. § 1346.

■ Here, the essence of the government's "honest services wire fraud" theory as to the Local 1 Counts was that the defendants schemed to defraud Local 1 union members of the honest services of two of their elected officials—Louis Saccenti and Steve Knott—by getting these officials to secretly act at the behest of the Gambino Family. In his appeal, Ciccone has not disputed that there was sufficient evidence demonstrating that he attempted to exercise control over the decisions of Saccenti and Knott. Rather, Ciccone argues that there is no evidence that Saccenti or Knott ever actually *acceded* to this coercion, and that the Local 1 members were therefore ultimately defrauded of nothing.

As the government points out, however, this Circuit has held that in wire fraud cases, it is the scheme itself, rather than its success, that is the required element for conviction. *United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir.1997). Ciccone has responded to this argument by attempting an analogy between the instant case and this Circuit's holding in *Rybicki* (an honest services wire fraud case) that

> private-sector honest services cases fall into two general groups, cases involving bribes or kickbacks, and cases involving self-dealing.... In bribery or kickback cases, the undisclosed bribery itself is sufficient to make out the crime, but in self-dealing cases, the existence of a conflict of interest alone is not sufficient to do so.... In the self-dealing context, though not in the bribery context, the defendant's behavior must thus cause, or at least be capable of causing, some detriment—perhaps some economic or pecuniary detriment—to the employer.

*Rybicki*, 354 F.3d at 139–141. Essentially, Ciccone suggests that this case is analogous to a "self-dealing" case, and that because no detriment to Local 1 actually occurred here, no liability can attach to the scheme. This argument fails for two reasons. First, we do not believe that an analogy can properly be drawn between a self-dealing case in the private sector and the conduct alleged here, *i.e.*, attempts to coerce union officials into shifting their loyalty from their union members to organized crime. Indeed, *Rybicki* stated that "[c]ases involving union officials tend to fit the pattern of the private-sector bribery cases" (in which case no showing of detriment is required) and that in any event, "[b]ecause federal law imposes special duties of loyalty on union officials, analysis of such cases may depart from analysis of other private sector cases." *Rybicki*, 354 F.3d at 140 & n. 14. Second, even assuming *arguendo* that this analogy could somehow stand, it is clear that the defendants' commission of this conduct was at least *capable* of causing some detriment (economic and otherwise) to the Local 1 members, which is all that *Rybicki* requires. We therefore reject Ciccone's challenge to the sufficiency of the evidence supporting his conviction of the Local 1 fraud counts.

Bondi, meanwhile, raises an additional challenge: he alleges that there was no evidence that he personally ever had any contact with Local 1 official Louis Saccenti, and that he simply happened to be present—by coincidence—when Cassarino visited Saccenti's house with the purpose of telling Saccenti to stop his resistance. Construing the facts in the light most favorable to the government, however, we believe that there was sufficient evidence to conclude that when, after Ciccone instructed Cassarino to take Bondi with him to tell Saccenti that he "better stop it ... otherwise, you know what's going to happen here?" and Bondi proceeded to accompany Cassarino to Saccenti's home, *see*

*supra* p. 307, Bondi did so as a participant in the criminal scheme. *See, e.g., Locascio,* 6 F.3d at 944 (stating that although "[t]raditionally, conspiracy law has required more than 'mere presence' or mere knowledge to sustain a conviction for conspiracy[.] . . . [t]here is a distinction between 'mere presence' and 'presence under a particular set of circumstances' that indicate participation," and that "presence coupled with other signs of involvement will be enough to sustain a conviction"). We therefore reject Bondi's challenge to the sufficiency of the evidence supporting his conviction of the Local 1 fraud counts.

### b. *The Local 1 Extortion Counts*

Bondi challenges his conviction of the Local 1 extortion counts on the same basis that he challenged his conviction of the Local 1 fraud counts: he suggests that it was mere coincidence that he was present when Cassarino went over to Saccenti's house in order to tell him to stop his resistance. For the reasons set forth above, we reject this argument and thus affirm his conviction of these counts.

### 2. The Local 1814 Counts [Ciccone]

■ The Local 1814 counts, as described in detail above, rested on the theory that Ciccone and other defendants had exercised control over the actions of Local 1814 President Scollo, thereby extorting and defrauding Local 1814 and its members. In his brief, Ciccone does not dispute that he exercised control over Scollo, but argues that Scollo's ultimate actions were consistent with the interests of Local 1814. He points out, for instance, that Scollo testified that he himself wanted to terminate Scala, and that Ciccone permitted him to do so.

As the government argues, however, the harm caused to Local 1814 was that Scollo generally had to seek Ciccone's permission before taking any significant action, and that the Local 1814 members were therefore deprived of Scollo's honest services. We agree. The Local 1814 members had the right to have Scollo—their elected representative—independently make the decisions that he wanted to make, according to the timetable that he thought appropriate. Because of Ciccone's control over Scollo, this was not possible. For instance, during the trial, when Scollo was asked whether he had felt that he had the authority to terminate Phil Scala, he answered "not really." Tr. 1449. He explained that he had to wait until "Sonny" [Ciccone] said "if you want to get rid of him, get rid of him," because "Sonny always told us when it's the big decisions that we should have to confer with him first." Tr. 1450. By ordering Scollo to "confer with him" on the "big decisions," Ciccone defrauded the Local 1814 members of Scollo's honest services. That Ciccone often ultimately permitted Scollo to follow through on his proposed course of action is irrelevant. We therefore reject Ciccone's challenge to his conviction of the Local 1814 counts.

### 3. The Howland Hook Counts

■ As set forth in detail above, the gravamen of the Howland Hook Counts was that Ciccone, along with other defendants, had extorted quarterly cash payments from Carmine Ragucci, the then-owner of Howland Hook, for a period of multiple years. On appeal, Ciccone apparently concedes that these cash payments were made, but states that there was insufficient evidence as to what these payments were for or why they were made, stressing that Carmine Ragucci himself never testified.

As discussed above, extortion is defined in the Hobbs Act as "the obtaining of property from another, with his consent,

induced by the wrongful use of actual or threatened force, violence, or *fear.*" 18 U.S.C. § 1951(b)(2) (emphasis added). This Circuit has stated that "[t]he statute does not limit the definition of extortion to those circumstances in which property is obtained through the wrongful use of fear created by implicit or explicit threats, but instead leaves open the cause of the fear," and we have indicated that the required showing is that the "defendant must knowingly and willfully create or instill fear, or use or exploit existing fear with the specific purpose of inducing another to part with his or her property." *United States v. Abelis,* 146 F.3d 73, 83 (2d Cir.1998) (internal quotation marks omitted).

Here, we believe that given the evidence described above, a reasonable jury could have concluded that Ciccone obtained these cash payments from Carmine Ragucci by exploiting Ragucci's fear of Ciccone, particularly given Scollo's testimony that Ciccone would be "pissed off" when the payments were late, and that Scollo would then communicate that displeasure to Ragucci. It is true that Ragucci did not himself testify, but there is no dispute that Ragucci made sizeable cash payments to Ciccone on a scheduled basis, no dispute that Ragucci would be told that Ciccone was "pissed off" when the payments were late, and no affirmative evidence whatsoever that these payments were for a legitimate purpose, such as repayment of a loan or payment for services rendered. Indeed, Ragucci's brother, Tommy—who worked with him at Howland Hook—specifically testified that he did not know of any legitimate basis for these payments. Scollo's testimony about the highly surreptitious nature of the transmission of the money, and the fact that he knew his involvement in it was "not the proper thing to do," further supports the conclusion that these payments were the result of extortion. Although Ciccone has posited on appeal various other reasons for why these payments were made, no evidence supporting such reasons was presented to the jury, and we cannot say that, construing all facts in the light most favorable to the government, a reasonable jury would have been unable to conclude that these payments were the result of extortion. We therefore reject Ciccone's challenge to his conviction of the Howland Hook Counts.

### 4. The Molfetta Counts

The Molfetta Counts, in turn, rested on the theory that Ciccone had extorted cash payments from Frank Molfetta, the owner of the Bridgeside Drayadge trucking company. In his brief, Ciccone acknowledges receiving cash payments from Molfetta, but argues that he "liberated Molfetta from [the] obligation" to pay Carmine Ragucci and that this was therefore not a case of extortion. This argument fails to persuade us that a reasonable jury could not have concluded that the payments were the result of extortion, for two reasons. First, Ciccone has never addressed the uncontradicted evidence that Molfetta had already concluded at least three years earlier that he was no longer obligated to pay Carmine Ragucci. This evidence, of course, seriously undermines Ciccone's claim that he somehow freed Molfetta from that obligation. Second, in his grand jury testimony, Molfetta himself stated that Ciccone had ordered him to start making monthly payments (retroactive to the prior month), and that he had made those payments out of fear, adding, "I'm afraid right now." *See supra* p. 308. Ciccone acknowledges the admissibility of Molfetta's grand jury testimony as a prior inconsistent statement, but states that "even crediting this, there was no proof that Ciccone affirmatively exploited any such fear." In so arguing, Ciccone fails to confront the actual substance of Molfetta's

testimony, which certainly provided sufficient evidence upon which a jury could conclude that he made the payments in question out of fear. We therefore reject Ciccone's challenge to the sufficiency of the evidence supporting his conviction of the Molfetta Counts.

### 5. The Money Laundering Counts [Peter Gotti, Richard G. Gotti, Ciccone]

Peter Gotti, Richard G. Gotti, and Ciccone were convicted of (1) money laundering conspiracy in violation of 18 U.S.C. § 1956(h) and (2) numerous acts of money laundering in violation of either 18 U.S.C. § 1956(a)(1)(A)(i) ("promotion money laundering") and 18 U.S.C. § 1956(a)(1)(B)(i) ("concealment money laundering"). As set forth in detail above, the money laundering charges essentially implicated the payment of cash "tributes" from the proceeds of illegal activities up the Gambino Family chain to Peter Gotti, as acting boss. (Ciccone, as described *supra*, both received moneys and paid a portion of those moneys up the chain to Peter Gotti.)

On appeal, the defendants-appellants make several arguments stemming from the statutory text of 18 U.S.C. § 1956.[10] We therefore begin with the relevant statutory language, which provides that

(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A) (i) with the intent to promote the carrying on of specified unlawful activity; or . . .

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a). The money laundering conspiracy provision, in turn, simply makes it a crime to conspire to commit the above acts. *See* 18 U.S.C. § 1956(h) ("Any person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.").

Thus, the money laundering charges against Peter Gotti, Richard G. Gotti, and Ciccone required the government to prove that the defendants, (1) knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, (2) conducted or attempted to conduct a financial transaction (3) which in fact involved the proceeds of that unlawful activity, (4) either (a) with the intent to promote the carrying on of that unlawful activity or (b) with the knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.

---

**10.** These arguments can be found in the briefs of both Peter Gotti and Ciccone. We assume that each joins in the other's arguments as relevant, and that Richard G. Gotti (who did not submit a separate brief) joins in all arguments relevant to him. We therefore refer to these arguments as being advanced by the "defendants-appellants," regardless of in whose brief they can be found.

The defendants-appellants argue that prongs two, three, and four were not met. We address each of these arguments in turn.

### a. *Prong 2: Conducting a Financial Transaction*

To evaluate the contention that there was insufficient evidence to show that the defendants-appellants conducted a financial transaction, we must first look to the statutory definitions of "conduct," "transaction," and "financial transaction."

Under 18 U.S.C. § 1956(c)(2), the term "conducts" is defined as "includ[ing] initiating, concluding, or participating in initiating, or concluding a transaction."

Under 18 U.S.C. § 1956(c)(3), the term "transaction" is defined as including

> a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery, by, through, or to a financial institution, by whatever means effected.

Finally, under 18 U.S.C. § 1956(c)(4), a "financial transaction" is defined as:

> (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

The defendants-appellants advance two arguments as to why the "conducting a financial transaction" prong was not met, both of which are primarily legal in nature. First, they argue that there was insufficient evidence to conclude that they conducted any transactions. Second, they argue that there was insufficient evidence to conclude that the alleged transactions they conducted were *financial, i.e.,* that the transactions "in any way or degree affect[ed] interstate or foreign commerce."

■ The defendants-appellants' first argument, advanced principally by Peter Gotti, is that at most, the government demonstrated the *receipt* of moneys, and that merely receiving funds cannot rise to the level of conducting a transaction. The statutory text, however, indicates the mere receipt of funds *does* constitute the conducting of a transaction pursuant to 18 U.S.C. § 1956(c)(2)-(3), under which (1) the term "conducts" includes participating in the conclusion of a transaction and (2) the term "transaction" includes transfers and deliveries. In other words, when a person accepts a transfer or delivery of funds, he has participated in the conclusion of that transfer or delivery, and has therefore conducted a transaction. This interpretation is also consistent with the indication in the legislative history that Congress intended the term "transaction" to be interpreted broadly. *See, e.g., United States v. Leslie,* 103 F.3d 1093, 1101–02 (2d Cir. 1997) (noting, with reference to the Senate Report, that "Congress intended the term 'transaction' to be interpreted broadly"). Indeed, the Sixth Circuit, sitting *en banc,* has specifically concluded that the delivery or transfer of cash to another person is a financial transaction, explaining that although the "mere transportation of cash" does not meet the definition of a financial transaction, the "purchase, sale, transfer, delivery, etc." of cash do qualify as trans-

actions, because they constitute "some disposition of funds." *See United States v. Reed,* 77 F.3d 139, 142–43 (6th Cir.1996) (en banc). We agree, and therefore reject the defendants-appellants' argument that the receipt of funds does not constitute a transaction.

■ We similarly reject the defendants-appellants' second argument: that the transactions in question were not "financial" because they did not affect interstate or foreign commerce. Our Circuit has stated that in the context of money laundering prosecutions under 18 U.S.C. § 1956, the only required showing is that "the individual subject transaction has, at least, a *de minimis* effect on interstate commerce." *Leslie,* 103 F.3d at 1100. We have explained that

> [t]he interstate commerce element of the money laundering statute, while an essential element, is jurisdictional in nature. The requirement that the transaction or financial institution affect interstate commerce means that *proof of a minimal effect* on interstate commerce is needed to support federal jurisdiction. The statute's requirement that the questioned activity 'affect commerce' in 'any way or degree' signals Congress's desire to exercise the full extent of its Commerce Clause power. Hence, the government's burden is not heavy.

*Id.* at 1101 (internal citations and quotation marks omitted) (emphasis added). Although the defendants-appellants argue that the mere receipt of moneys cannot affect interstate commerce, and that it is inappropriate to look at the conduct that gave rise to the money in the first place, we have held, since *Leslie,* that it is indeed permissible to consider the conduct that gave rise to the laundered funds. *See, e.g., United States v. Goodwin,* 141 F.3d 394, 402 (2d Cir.1997) (stating that laundering of narcotics proceeds met the jurisdictional

requirement because "narcotics trafficking and money laundering are activities which, in the aggregate, will undoubtedly affect interstate commerce") (internal citations omitted); *see also United States v. Hatcher,* 323 F.3d 666, 672 (8th Cir.2003) (holding that the money laundering counts were linked to interstate commerce because they stemmed from a purchase of stolen jewelry, and the robbery of that jewelry had affected interstate commerce).

This interpretation, in turn, makes clear that the money laundering offenses charged in this case affected both interstate and foreign commerce. The moneys in question were alleged to be the proceeds of the Hobbs Act extortions and other illegal activities discussed in detail above. The alleged extortion victims were businesses and unions that engaged in interstate commerce, and the gambling operations (in which the defendants allegedly operated the New York branch of a Costa Rican bookmaking enterprise) were international in scope. As such, these criminal activities affected interstate and foreign commerce, and the laundering of their proceeds also affected interstate commerce by promoting the activities that gave rise to them. Moreover, as the government also notes, the alleged money laundering activity (which resulted in the payment of "tributes" up to Gambino Family leaders such as Gotti and Ciccone) also affected interstate commerce insofar as it promoted the Gambino Family's operation—which clearly affects interstate commerce—as a whole.

We believe that these factors collectively demonstrate that the money laundering had at least the minimal effect on interstate commerce necessary to satisfy the jurisdictional requirement, and we therefore reject the defendants-appellants' argument that there was insufficient evidence to find that they conducted financial

transactions within the meaning of 18 U.S.C. § 1956.

### b. *Prong 3: Proceeds of Unlawful Activity*

The defendants-appellants next argue that even assuming *arguendo* that the receipt of the moneys in question constituted a financial transaction, there was insufficient evidence to conclude that these moneys represented the proceeds of a specified unlawful activity. In contrast to the essentially legal nature of the prong two analysis, the defendants-appellants' argument as to this prong requires a more fact-specific inquiry.

██ The gravamen of the defendants-appellants' contentions here is that the government did not sufficiently link the moneys in question to specified unlawful activities, but simply argued that the proceeds came from various possible unlawful sources. Under our Circuit's precedent, the government is required to link the moneys in question to specified unlawful activities, but this link can be made through circumstantial evidence. *See United States v. Reiss*, 186 F.3d 149, 152–153 (2d Cir.1999) (concluding that various pieces of evidence gave rise to the inference that the laundered funds in question were drug proceeds).

██ Here, we conclude that the government adduced evidence sufficient to prove that the moneys in question derived from Hobbs Act extortions and illegal gambling businesses. Indeed, as set forth in detail above, the government presented evidence indicating that these moneys came from, *inter alia,* the Molfetta extortion, the MILA kickbacks, and the joker-poker machines that the Gambino Family placed in businesses including Café Roma. *See supra* pp. 310–311.

### c. *Prong 4: Intent of Promoting or Concealing the Unlawful Activity*

Finally, the defendants-appellants argue that at most, the government has shown that cash payments were made up to Peter Gotti, and that even if it could be shown that this money derived from unlawful activities, his receipt of the money was separate from, and neither promoted nor concealed, those activities. As noted above, either the promotion or the concealment prong is a required element of a money laundering conviction.

██ Based on our review of the trial evidence, we believe that there was ample evidence upon which a jury could conclude that the defendants-appellants participated in concealment money laundering, *i.e.,* that they participated in a transaction (delivery of the cash) that was designed at least in part to conceal the source of these moneys. As noted above, at trial the government adduced evidence that the process by which the cash tributes were transmitted was highly complex and surreptitious. For example, the defendants would communicate about the transactions in coded language (*i.e.,* by referring to Peter Gotti as "him" or "the guy" rather than by name); the money would be transmitted to Peter Gotti through several intermediaries; the money would be transmitted in a surreptitious manner; and the payments were made in cash. *See supra* pp. 310–312. We therefore believe that a reasonable jury could infer that Peter Gotti accepted the cash payments knowing that the deliveries of those payments had been designed in a way that would conceal the source of the moneys.[11] *See, e.g., United*

---

**11.** Because only the concealment *or* the promotion prong must be met, we do not reach

the separate question of whether the jury could have also concluded that Peter Gotti,

*States v. Prince,* 214 F.3d 740, 752 (6th Cir.2000) (finding the concealment prong met by the elaborate arrangements for transmitting the money in question, which protected the defendants from a paper trail); *United States v. Cruzado–Laureano,* 404 F.3d 470, 483 (1st Cir.2005) (stating that a conviction of concealment money laundering requires "evidence of intent to disguise or conceal the transaction, whether from direct evidence, like the defendant's own statements, or from *circumstantial evidence,* like the use of a third party to disguise the true owner, or *unusual secrecy* ") (emphasis added).

### 6. The Tommy Ragucci Counts [Ciccone]

■ Ciccone next challenges his conviction of the Tommy Ragucci Counts, which—as described above—rest on the allegation that Ciccone conspired and attempted to force Tommy Ragucci to resign from his job at Howland Hook, and thus to obtain the value of his right to compete for that job. In challenging the sufficiency of the evidence supporting these convictions, Ciccone argues that "[n]o evidence of any threat communicated to [Tommy] Ragucci was elicited," that at worst, Ciccone simply "made a determination or recommendation that [Tommy] Ragucci should be replaced by Anastasia," and that there is no evidence "of any affirmative exploitation of [Tommy] Ragucci's fear [of Ciccone] much less that Ciccone was aware of it."

These arguments, however, are directly contradicted by the wiretapped conversation between Ciccone and Scollo as to Tommy Ragucci, in which Ciccone instructed Scollo: "Tell him I don't want him there. Tell him I don't want him there." *See supra* p. 312. They are also squarely contradicted by Tommy Ragucci's own testimony that Scollo told him that Ciccone

wanted him to step down, which caused him to feel intimidated. *See id.* We therefore believe that there was ample evidence upon which a jury could conclude that Ciccone attempted to extort the economic value of Tommy Ragucci's right to compete for his position at Howland Hook.

### 7. The Zinna Count [Ciccone]

The Zinna Count, as set forth above, rests on the allegation that Ciccone schemed with other defendants to demand $5,000 in cash from Zinna. In challenging the sufficiency of the evidence supporting his conviction on this count, Ciccone principally argues that there is no proof that Zinna was ever actually asked for this money. This argument fails to appreciate that the Zinna Count did not charge Ciccone with extortion itself, but with *conspiracy* to extort. The evidence described above is certainly sufficient to support a fact-finder's conclusion that Ciccone schemed with Cassarino and Scollo to extort property from Zinna, in violation of the Hobbs Act. *See supra* p. 313; *see also United States v. Clemente,* 22 F.3d 477, 480 (2d Cir.1994) ("In order to establish a Hobbs Act conspiracy, the government does not have to prove any overt act.... The government needs to prove only that an agreement to commit extortion existed, not that extortion was actually committed."). Ciccone also argues that there is no evidence that Scollo and Cassarino actually agreed to carry out his orders to extort the money from Zinna. In the conversation between Ciccone, Scollo, and Cassarino, however, the three men discussed Zinna's activities with shared disapproval, and expressed no hesitation about carrying out Ciccone's orders to extort him. We therefore reject Ciccone's challenges to this conviction.

Richard G. Gotti, and Ciccone engaged in

"promotion money laundering."

### 8. The Marinelli Counts [Ciccone]

The gravamen of the Marinelli Counts, as described above, was that after Marinelli enlisted the help of Ciccone and Cassarino in obtaining his workers' compensation payments, they extorted a portion of the proceeds from him. In challenging the sufficiency of the evidence supporting his conviction of these counts, Ciccone argues that there was no evidence that Marinelli paid Ciccone and Cassarino out of fear, noting that Marinelli was the one who initially contacted Ciccone and Cassarino for the help in question. This argument does not respond, however, to the evidence that once Marinelli *did* contact Ciccone and Cassarino (and later received his payment), Ciccone and Cassarino demanded a portion of the proceeds and then instructed Marinelli's son, Vito, that the initial $5,000 payment was insufficient. *See supra* p. 314. It seems clear that a reasonable factfinder could conclude that at this point, Marinelli's decision to pay them another $5,000 was prompted by fear. Indeed, Marinelli's son, Vito, specifically testified at trial about his fear of not paying enough. *See id.* We therefore reject Ciccone's argument that there was insufficient evidence supporting his conviction of this count.

### 9. The Alayev Counts [Bondi][12]

The only sufficiency-of-the-evidence challenge to the Alayev Counts has been brought by Bondi, who argues that he was not personally involved in the Eduard Alayev extortion. At trial, however, the government adduced evidence sufficient to tie Bondi to the extortion. Specifically, as noted above, Alayev testified that both Cassarino and Bondi came together to order him to install gambling machines at Café Roma. *See supra* p. 313. The government also introduced wiretap evidence in which Bondi provided Cassarino with information about Alayev (whom they referred to as "Eddie") and the goings-on at Café Roma. *See supra* p. 314. Alayev also testified at trial that Bondi was the person who would come to collect the money from the gambling machines, and would sometimes give him some of the proceeds. *See supra* p. 314. Based on the above, we conclude that there was sufficient evidence for the jury to tie Bondi to the Alayev extortion.

### 10. The Seagal Counts [Ciccone]

Ciccone next challenges the sufficiency of the evidence supporting his conviction of the Seagal Counts, which essentially alleged that he had attempted to force Seagal to work with Jules Nasso. On appeal, Ciccone acknowledges that Seagal was subjected to fear by other Gambino Family associates, but asserts that he had no involvement in these interactions. The evidence adduced at trial, however, plainly supported a finding that Ciccone himself was involved in exploiting Seagal's fear of him in order to get him to work with Jules Nasso. Indeed, Seagal testified to numerous instances in which Ciccone interacted with him in a threatening manner while telling him to resume his business relationship with Jules Nasso and to pay the defendants significant sums of money. *See supra* pp. 315 – 316. The wiretap evidence also indicated that Ciccone was directly involved in the pressure brought to bear on Seagal. *See supra* p. 316. Accordingly, we reject this challenge.

---

**12.** Although Ciccone was also convicted of the Alayev counts, he has not challenged on appeal the sufficiency of the evidence supporting these counts. Since all of Bondi's arguments as to the Alayev Counts are specific to him, we assume that Ciccone does not join in them.

### 11. The Gambling Counts [Bondi][13]

Bondi (presumably joined by Ciccone) next argues that there was insufficient evidence to support his gambling convictions for bookmaking and joker-poker under 18 U.S.C. § 1955. This statute provides that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an *illegal gambling business* shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1955(a) (emphasis added). An "illegal gambling business," in turn, is defined as one which

> (i) is a violation of the law of a State . . . in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955(b)(1).

Bondi argues that his convictions for bookmaking and joker-poker did not satisfy these statutory requirements.

#### a. *Bookmaking*

With regard to the bookmaking count, Bondi essentially makes three arguments as to why there was insufficient evidence to convict him of bookmaking. His first two arguments arise from the 18 U.S.C. § 1955(b)(1)(i) requirement that the business must violate the law of the State in which it was conducted. His third argument arises from the 18 U.S.C. § 1955(b)(1)(ii) requirement that the business involve five or more persons who conduct, finance, manage, supervise, direct, or own all or part of the business.

■ First, Bondi asserts that the bookmaking business was not a violation of New York law (and therefore did not satisfy the requirements of 18 U.S.C. § 1955(b)(1)(i)) because Pelican Sports was located offshore in Costa Rica, its actions were legal there, and no bets were received or accepted in New York. At trial, however, the government adduced evidence sufficient to conclude that the defendants, who were New York-based, had been operating a local branch of the business, essentially managing a stable of clients who placed their bets from New York. *See supra* pp. 317 – 318. When bets are placed from New York, the gambling activity is illegal under New York law, regardless of whether the activity is legal in the location to which the bets were transmitted. *See, e.g., People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc.2d 852, 859–60, 714 N.Y.S.2d 844 (N.Y.Sup.1999) ("[U]nder New York Penal Law, if the person engaged in gambling is located in New York, then New York is the location where the gambling occurred (*see* Penal Law § 225.00(2))[14] . . . . It is irrelevant that Internet gambling is legal in Antigua. The act of entering the bet and transmitting the information from New York via the Internet is adequate to constitute gambling activity within New York State."). New York Penal Law

---

**13.** In his brief, Ciccone did not raise specific arguments as to the Gambling Counts, of which he was also convicted. We assume, however, that he joins in the arguments advanced by Bondi, because they are generally applicable rather than specific to Bondi.

**14.** N.Y. Penal Law § 225.00(2) defines "gambling" as follows: "A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."

§ 225.00(4) further provides that "[a] person 'advances gambling activity' when, acting other than as a player, he engages in conduct which materially aids any form of gambling activity," which the defendants here did. Thus, the defendants violated New York law by organizing a bookmaking operation through which bettors made their bets from New York.

Second, Bondi argues that the bookmaking business was not a violation of New York state law because there was no evidence that the bookmaking business accepted bets in any one day that totaled more than $5,000. *See* N.Y. Penal Law § 225.10 ("A person is guilty of promoting gambling in the first degree when he knowingly advances or profits from unlawful gambling activity by (1) engaging in bookmaking activity to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars...."). The betting records introduced into evidence at trial, however, indicated that the defendants' New York operation of Pelican Sports did take in more than five bets totaling more than $5,000 on certain days. *See, e.g.,* Gov't Exh. 65.

Third, Bondi argues that the government did not satisfy the § 1955(b)(2) standard of showing that at least five people were involved in the defendants' operation. At trial, however, the government adduced evidence that in addition to Bondi, co-defendants Ciccone, Cassarino, Brancato, Thomas Lisi, Jerome Orsino, and Carmine Malara were also involved in the bookmaking operation.[15] Thus, Bondi's arguments

as to the sufficiency of the evidence on the bookmaking charges lack merit.

b. *Joker–Poker*

Bondi also asserts that the elements of 18 U.S.C. § 1955 were not satisfied with respect to the joker-poker charges, principally on grounds that the joker-poker machines in question were not illegal gambling devices.

■ As noted above, 18 U.S.C. § 1955 makes illegal only those gambling businesses that are a violation of the law of the state in which they are conducted. Under New York State law, an illegal gambling device is a machine usable in the playing phases of any "gambling activity." N.Y. Penal Law § 225.00(7). "Gambling," in turn, is defined as the staking or risking of *"something of value* upon the outcome of a *contest of chance* ...", upon an agreement or understanding that [the individual] will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2) (emphasis added). "Something of value" is defined as "any money or property, any token, object, or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein." N.Y. Penal Law § 225.00(6). A "contest of chance" is defined as a "game ... in which the outcome depends in a material degree upon an element of chance, notwithstanding that the skill of the contestants may also be a factor therein." N.Y. Penal Law § 225.00(1). Thus, in sum, an illegal gambling device is a machine that is used in an activity where money (or something else of

---

**15.** Malara and Lisi pled guilty, and their pleas were admitted into evidence. Under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which was decided after the trial, that admission was improper. At trial, however, the government also adduced overwhelming factual evidence

that at least five defendants—Ciccone, Casarino, Bondi, Orsino, and Brancato—were involved in the bookmaking business, and also adduced independent evidence as to the involvement of Malara and Lisi. *See supra* pp. 317–318; *see infra* pp. 345–346.

342

value) is staked upon the outcome of a contest that depends in a material degree upon chance.

■ On appeal, Bondi raises several arguments as to why the government failed to adduce sufficient evidence that the joker-poker machines in question were illegal gambling devices. First, he contends that there was no evidence that people who played the machines actually received something of value from them. Second, he argues that the games in question were games of skill rather than contests of chance. Both of these arguments lack merit. As to Bondi's "something of value" argument, the government adduced evidence that customers of the machines in question would purchase credits to play the machines, that they would receive credits if they won, and that they could ultimately redeem these credits for cash. *See supra* pp. 318–319. Thus, there is no question that the customers risked something of value—money—upon the outcome of the games played on the machines. As to Bondi's argument that the games were games of skill rather than chance, he fails to recognize that a "contest of chance" encompasses games in which the skill of the contestants may play a role, as long as the outcome depends in a material degree on chance. Bondi concedes that the games in question had the theme of poker, and he has not contended in his brief that chance does not play a material role in the outcome of a poker game.

Bondi also argues that there was no proof that the games in question were in fact joker-poker games, pointing to the testimony of the government's expert witness, Detective Martin, that he had not seen any "pure" joker-poker machines. This argument, however, misconstrues Detective Martin's testimony. Detective Martin consistently referred to "joker-poker type machines" as an umbrella term

encompassing different types of illegal gambling machines. *See, e.g.*, Tr. 3557–58. In the statement at issue, he was simply clarifying that he had not seen any of the subset of joker-poker machines that involve playing poker with actual cards displayed on the machine's screen (called "pure" joker-poker machines). Tr. 3569–70 (Q. "There are no pure Joker–Poker machines that you have seen in this entire case, correct?" A. "Card machines, no, but clearly machines, like Lucky Eight Lines.")

Finally, Bondi suggests that the indictment's gambling count referring to joker-poker [Count 66] should have been dismissed because that count incorrectly referred to New York Penal Law § 225.10 (which was relevant to the bookmaking charge), rather than New York Penal Law § 225.30 or § 225.05. Bondi previously raised this argument to the district court, which rejected it on grounds that under *United States v. Eucker*, 532 F.2d 249, 257 (2d Cir.1976), "if an indictment properly charges an offense, it is sufficient, even though an inapposite statute is referred to therein." We agree with the district court's resolution of that issue. *See also* Fed. R.Crim.P. 7(c)(3) ("Unless the defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction.").

### 12. The Witness Tampering Count [Ciccone]

■ The final sufficiency-of-the evidence challenge is brought by Ciccone on the Witness Tampering Count involving Anthony Frazetta (Bondi's stepson). This count arose under 18 U.S.C. § 1512(b), the witness tampering provision of the federal Obstruction of Justice Act, 18 U.S.C. § 1501 *et seq.* Pursuant to 18 U.S.C.

§ 1512(b), it is unlawful to knowingly "intimidat[e], threaten[ ], or *corruptly persuade* [ ] another person, with intent to ... prevent the testimony of any person in an official proceeding" (emphasis added). This Circuit has defined "corrupt persuasion" as persuasion that is "motivated by an improper purpose." *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir.1996). We have also specifically stated that the Obstruction of Justice Act can be violated by corruptly influencing a witness to invoke the Fifth Amendment privilege in his grand jury testimony. *See United States v. Cioffi*, 493 F.2d 1111, 1118 (2d Cir.1974).

In his brief, Ciccone argues that he was merely suggesting that Frazetta, who had every right to invoke the Fifth Amendment privilege, do so, and argues that this suggestion was not motivated by an improper purpose. We believe, however, that there was sufficient evidence upon which a jury could conclude that Ciccone indeed had an improper purpose in "suggesting" to Frazetta (via a command to his stepfather, Bondi, over whom he had authority under the hierarchical structure of the Gambino Family) to plead the Fifth Amendment: Ciccone wanted to ensure that Frazetta did not implicate him. *See supra* pp. 318–319. We therefore reject Ciccone's challenge to his conviction on this count.

## C. The Defendants' Other Challenges

The defendants-appellants also raise several other challenges to their convictions, all of which we reject.

### 1. The *Crawford* Error

Defendant-appellant Bondi argues that the admission of guilty pleas by co-defendants Malara and Lisi as to the bookmaking counts violated *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), therefore mandating reversal of his convictions on those counts.

It is undisputed that under *Crawford*, which was decided one year after this trial, the admission of these guilty pleas—which were admitted for the purpose of showing that the bookmaking business employed five or more people, a required element for conviction under 18 U.S.C. § 1955(b)(1)—was error. This Court has explained, however, that *Crawford* errors should be reviewed under a "harmless error" standard. *See, e.g., United States v. McClain*, 377 F.3d 219, 222 (2d Cir.2004) ("The erroneous admission of the three plea allocutions is therefore reviewable for harmless error, and does not necessitate a new trial as long as the government can show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.") (internal quotation marks and citation omitted). In this case, we believe that the admission of Malara's and Lisi's guilty pleas was harmless. Even absent any evidence as to Malara and Lisi, there was overwhelming evidence at trial that five other defendants—Bondi, Ciccone, Cassarino, Orsino, and Brancato—were involved in the bookmaking business. *See supra* pp. 317–318. (Additionally, there was also independent evidence adduced by the government as to the involvement of Malara and Lisi. *See id.*)

The existence of this other evidence as to the involvement of at least five people in the bookmaking business renders the *Crawford* error harmless. Accordingly, we reject this challenge.

### 2. The Wiretap Challenge

The next argument brought by Bondi (and, presumably, joined in by the other defendants-appellants) is that the district court erred in denying a motion to suppress the products of a wiretap on co-

defendant Cassarino's cellular phone.[16] The warrant for this wiretap was originally authorized by Justice Nancy Smith of the New York Supreme Court, Appellate Division, Second Department, on April 5, 2000. Justice Smith concluded, based primarily upon the affidavit of Joseph Rauchet, Deputy Chief Investigator for the New York State Attorney General's Task Force on Organized Crime ("OCTF"), that there was probable cause to believe that Cassarino and others were "committing and are about to commit the crimes of Promoting Gambling, Possession of Gambling Records and Conspiracy to commit those crimes ... and that evidence of these crimes may be obtained by the interception and recording of ... communications" on Cassarino's cell phone.

Before trial, Cassarino moved to suppress the fruits of this wiretap. The district court denied that motion on December 18, 2002, concluding that probable cause supported the wiretap and that even assuming that probable cause had been absent, the agents enforcing the warrant relied in good faith upon it. This Court reviews that determination *de novo*. *See, e.g., United States v. Smith*, 9 F.3d 1007, 1011 (2d Cir.1993) ("On an appeal from a ruling on a motion to suppress, we review a district court's findings of historical fact for clear error, but analyze *de novo* the ultimate determination of such legal issues as probable cause and the good faith of police officials in relying upon a warrant.").

■ Here, we agree with the district court that probable cause supported the issuance of the warrant for the wiretap. As noted above, the initial application for the wiretap was based upon Rauchet's lengthy and detailed affidavit. Rauchet set forth four categories of information supporting a wiretap of Cassarino's cell phone: (1) surveillance evidence; (2) analysis of telephone toll records supplied by Sprint on the Cassarino cell phone; (3) Cassarino's use of false subscriber information on his cell phone; and (4) Rauchet's own opinions, based on his experience of over fifteen years investigating organized crime and gambling.

First, in terms of surveillance evidence, Rauchet described numerous instances of meetings between Cassarino and high-level Gambino Family members, such as Louie Vallario (an alleged "capo" in the Gambino Family), Brancato, and Ciccone. In fact, in one conversation overheard by an OCTF Special Investigator, Cassarino and Brancato allegedly discussed football gambling, that one location was making "barrels of money," and that off-shore gambling locations "could not be touched." Second, in analyzing Cassarino's Sprint records, Rauchet described numerous calls between Cassarino's cell phone and various high-level Gambino Family officials. Third, Rauchet noted that Cassarino's cell phone number was listed to "Cassarino Prime" rather than Primo Cassarino, that it was linked to the contact address for Jerry's Café (an alleged meeting place for the Gambino Family) rather than Cassarino's home address, and that the Social Security number associated with the cell phone was off by one digit. Rauchet stated that "[i]n my experience, those who utilize telephones to engage in illegal activities often attempt to disguise their identities." Fourth, based on his lengthy experience, Rauchet set forth his opinions about the nature of the Gambino Family's gambling enterprises, and specifically opined that Ciccone (who, as a Gambino captain, had a higher profile) had used Cassarino "to carry messages to and set up meetings with other members of the

---

**16.** Bondi raises this claim as an "aggrieved person" pursuant to 18 U.S.C. § 2518(10)(a).

Gambino Crime Family in order to guide and perpetuate gambling enterprises."

Based on the above, we conclude that under the federal "totality of the circumstances" standard, there was probable cause to conclude that Cassarino was engaged in criminal activity. *See United States v. Rowell*, 903 F.2d 899, 902 (2d Cir.1990) (holding that the relevant standard for federal courts on motions to suppress evidence obtained under a state-issued wiretap warrant is whether "the totality of the circumstances indicate a probability of criminal activity"). It is true that, as Bondi argues, Rauchet's affidavit included an incorrect statement: namely, that Cassarino had been convicted of a Hobbs Act violation, when in fact Cassarino had only been *arrested* for a Hobbs Act violation. (According to the government, this error occurred because a detective misread Cassarino's rap sheet to Rauchet over the telephone.) As the district court noted, however, even without this misstatement, the affidavit still set forth ample evidence from which to find probable cause. Bondi's other arguments about "misstatements and omissions" contained in Rauchet's affidavit essentially amount to alternative explanations for Rauchet's observations. Although these explanations are not necessarily wholly implausible, they do not undermine the notion that there was at least probable cause upon which the warrant could issue. We therefore reject this challenge.

### 3. Partial Sequestration of an Anonymous Jury

Peter Gotti contends that the district court erred in empaneling an anonymous and partially sequestered jury.[17] The other defendants-appellants presumably join in this argument as well.

 The parties agree that in this Circuit, a court may order the empaneling of an anonymous jury upon "(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir.1991). "Within these parameters, the decision whether or not to empanel an anonymous jury is left to the district court's discretion." *Id.*

 Gotti does not argue that reasonable precautions were not taken to minimize prejudicial effects. Nor can he, as the precautions set forth in *Paccione*— conducting a thorough voir dire and providing the jurors with a plausible and non-prejudicial reason for not disclosing their identities, *see id.*—were followed here. The district court made use of a juror questionnaire that was jointly submitted, and instructed the jury that the special precautions had been implemented to protect them from the inquiring media.

Instead, Gotti's argument goes solely to prong one of the *Paccione* standard: whether there was strong reason to believe that the jury needed protection. Here, the case law from this Circuit makes clear that the district court legitimately found strong reason to believe that the jury needed protection, and that it therefore did not abuse its discretion by granting the government's motion. *See Paccione*, 949 F.2d

---

17. The government originally moved for an anonymous and partially sequestered jury in a letter-brief dated October 30, 2002. Their submission was accompanied by the supporting affidavit of FBI Special Agent John P. Mullaney. On January 13, 2003, the district court issued a four-page Opinion and Order granting the Government's motion and explaining its reasons for doing so.

at 1192 (collecting cases and stating that sufficient reason for empaneling anonymous juries has been found in cases where (a) "the defendants have been charged with grand jury tampering and the trial is expected to attract publicity"; (b) "the defendant has a history of attempted jury tampering and a serious criminal record"; (c) "there had been extensive pretrial publicity and there were abundant allegations of dangerous and unscrupulous conduct"; or (d) "the defendants were alleged to be very dangerous individuals who had participated in ... mob-style killings and there was strong evidence of the defendants' past attempts to interfere with the judicial process") (internal citations and quotation marks omitted). Here, the district court identified the following factors as relevant to its decision: (1) that the defendants were charged with membership in a powerful crime organization, the Gambino Family; (2) that the defendants included Gotti, the alleged head of the Gambino Family (whose pretrial detention had already been ordered by the district court and affirmed by this Circuit due to "dangerousness" [18]) as well as Ciccone, a Gambino Family captain, whose pretrial detention had similarly been ordered by the district court due to dangerousness, *United States v. Ciccone*, 2002 WL 1575429 (E.D.N.Y. July 16, 2002); (3) that the indictment itself charged two defendants with witness tampering in connection with grand jury testimony; and (4) that there was expected to be intense media coverage and public interest in the trial. The presence of these factors unquestionably made this case one in which the district court

had the discretion to empanel an anonymous and partially sequestered jury. We therefore reject this challenge as well.

## III. CHALLENGES BY THE DEFENDANTS AND THE GOVERNMENT TO THE DEFENDANTS' SENTENCES

We turn finally to the challenges brought by the defendants-appellants (and, in the case of Peter Gotti, the government) to the sentences imposed by the district court in this case. As noted above, we need not address Richard G. Gotti's sentence, which was already remanded to the district court in a prior proceeding.

### A. Peter Gotti

#### 1. Peter Gotti's Challenges to His Sentence and Forfeiture Order

Peter Gotti challenges both the length of his sentence and the $3,749,250 forfeiture order against him. With regard to his various challenges to the judicial fact-finding that influenced the calculation of his Guidelines sentence, we vacate his sentence pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005), so that the district court can determine whether to resentence him.

We reject, however, his contention that the forfeiture order should be vacated and remanded for recalculation. In this regard, Peter Gotti argues solely that the order was excessive, because his RICO convictions stemmed solely from his money laundering convictions, and he was not convicted of the more lucrative aspects of

---

**18.** In *United States v. Gotti*, 219 F.Supp.2d 296, 299–300 (E.D.N.Y.2002), a related proceeding in which the district court had upheld the pretrial detention of Peter Gotti, the district court had specifically stated that Peter Gotti was the alleged "Acting Boss of the Gambino Family" and that on the basis of Second Circuit precedent, he was obliged to

rule that Peter Gotti should be detained. We affirmed, while disavowing the notion of a per se rule regarding purported Mafia crime bosses, and reiterating the need for a fact-specific inquiry (which, in this case, warranted detention). *United States v. Ciccone*, 312 F.3d 535, 542–43 (2d Cir.2002).

the racketeering scheme, such as the ILA/MILA extortions and frauds.

Initially, we note that Peter Gotti did not raise this argument at trial. Therefore, we must review it under a plain error standard, which requires a showing that there was an error, that it was plain, that it affected substantial rights, and that it seriously affected the fairness, integrity, or public reputation of judicial proceedings. *See, e.g., United States v. Williams,* 399 F.3d 450, 454 (2d Cir.2005).

Here, we do not believe that there was error, let alone plain error. Peter Gotti was convicted of racketeering and racketeering conspiracy under 18 U.S.C. § 1962. Under 18 U.S.C. § 1963(a)(3), a defendant who is convicted of 18 U.S.C. § 1962 is to forfeit "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962." The district court expressly found that it was reasonably foreseeable to Peter Gotti that the racketeering enterprise in which he participated would engage in activities such as those underlying the ILA/MILA Counts. See March 26, 2004 Sentencing Tr. at 57–59. That finding is supported by the evidence adduced at trial and is sufficient to support the challenged forfeiture order. *See, e.g., United States v. Fruchter,* 411 F.3d 377, 384 (2d Cir. 2005) (stating, in challenge to RICO forfeiture amount, that "[s]o long as the sentencing court finds by a preponderance of the evidence that the criminal conduct through which the proceeds were made was foreseeable to the defendant, the proceeds should form part of the forfeiture judgment").

## 2. The Government's Challenge to Peter Gotti's Sentence

When sentencing Peter Gotti, the district court concluded that under a preponderance of the evidence standard, Gotti was the acting boss of the Gambino Family during all relevant times, and determined that the ILA Counts, MILA Counts, Local 1 Counts, Howland Hook Counts, Molfetta Counts, Tommy Ragucci Counts, Zinna Counts, Marinelli Counts, and Alayev Counts constituted relevant conduct. March 26, 2004 Sentencing Tr. 40, 70–86. The district court also said that it was going to impose a leadership role enhancement under U.S.S.G. § 3B1.1 to reflect Gotti's leadership role in the enterprise. *Id.* at 67–72. When the sentencing resumed several weeks later, however, the district court stated that it had changed its mind, and although it still considered the various counts listed above to constitute "relevant conduct" for sentencing purposes, it was no longer convinced that the leadership role enhancement was warranted. April 15, 2004 Sentencing Tr. 10–20.

The government argues that this change in position constituted error on the district court's part. It acknowledges that the Guidelines are now advisory, and that Peter Gotti's sentence will in any event be remanded to the district court under *Crosby,* at which point the district court may ultimately choose to impose a non-Guidelines sentence. It argues, however, that appellate review is still warranted at this juncture, so that the district court will—in the context of reconsidering Peter Gotti's sentence under *Crosby*—be able to start with the correct calculation of his Guidelines sentence. We agree that, in the interest of efficiency, it is appropriate for us to address this issue now.

To evaluate the government's argument as to whether a leadership role enhancement had to be imposed under the Guidelines, it is first necessary to look at the text of U.S.S.G. § 3B1.1. U.S.S.G. § 3B1.1(a) provides for a four-level en-

hancement if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b) provides for a three-level enhancement if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."

The commentary to this section is also instructive. First, the introductory commentary notes that "[t]he determination of a defendant's role in the offense is to made on the basis of all conduct ... and not solely on the basis of elements and acts cited in the count of conviction." Second, Application Note 2 provides that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1 app. n. 2. Third, Application Note 4 provides that "[i]n distinguishing a leadership and organizational role from one of mere management or supervision, titles such as 'kingpin' or 'boss' are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 app. n. 4. Finally, the "background" states that "[t]his adjustment is included primarily because of concerns about relative respon-

sibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate."

In explaining why it had decided not to impose a leadership enhancement on Gotti, despite finding him to have been the "acting boss" and despite finding the various uncharged conduct to constitute "relevant conduct" for sentencing purposes, the district court explained that it did not "think it automatically follows that because somebody is the acting boss of the crime family that he's responsible for these four level enhancements in each and every relevant conduct scenario." April 15, 2004 Sentencing Tr. 11. The district court referred to Application Note 4's statement that "titles such as kingpin or boss are not controlling," and its emphasis on actual decision-making authority. It concluded:

The court understands this application note to mean that it is not enough for the government simply to establish that Mr. Gotti held the position of acting boss, but rather it must present some evidence to show an active role in his participation. Applying the application note factors, the Court notes that none of them support—well, maybe with the exception of one, support the finding that Mr. Gotti was an organizer or leader within the meaning and intent of the guideline provision....

The specific evidence put forward in this case strongly suggested that Peter Gotti did not exhibit typical leadership characteristics that one would expect of the acting boss of a New York crime family, but was simply filling a power vacuum brought about by the incarceration of other members of the Gotti family....

There's simply no evidence before the Court that Mr. Gotti exercised decision-making authority in the commission of these crimes constituting the relevant conduct, that he participated in their commission. There's nothing. In fact, the evidence shows that he did not participate in their commission. . . . That he recruited any accomplices for those particular crimes, that the tribute payments he received amounted to a larger share of the fruits of the crime[,] is debatable.

*Id.* at 13–15.

 On appeal, the government urges us to find error in the district court's refusal to impose the four-level enhancement. This Circuit has not always been consistent in describing the standard of review for such determinations, *i.e.,* whether we review a district court's decision not to impose a leadership enhancement under a *de novo* or under a clear error standard. *See, e.g., United States v. Huerta,* 371 F.3d 88, 91 (2d Cir.2004) (collecting cases, and noting the divergence among various panels of this Court). In *Huerta,* we ultimately declined to reach the question, on grounds that we would reach the same result regardless of which standard applied. *Id.* Subsequently, we held that, as a general matter, in determining the appropriate standard of review for a district court's application of the Guidelines to the specific facts of a case, we should follow an "either/or approach," adopting a *de novo* standard of review when the district court's application determination was primarily legal in nature, and adopting a "clear error" approach when the determination was primarily factual. *See United States v. Vasquez,* 389 F.3d 65, 75 (2d

Cir.2004). Since the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), which rendered the Guidelines advisory rather than mandatory, we have continued to follow this "either/or" approach. *See, e.g., United States v. Selioutsky,* 409 F.3d 114, 118–119 (2d Cir.2005) (explaining that "even under the post-*Booker* sentencing regime, calculation of a correct Guidelines sentencing range will normally be part of the process of determining an appropriate sentence"; that our appellate review of a sentence will therefore include an evaluation of the district court's Guidelines calculation; and that in performing such an evaluation, we will "review issues of law *de novo,* issues of fact under the clearly erroneous standard, [and] mixed questions of law and fact either *de novo* or under the clearly erroneous standard depending on whether the question is predominantly legal or factual") (internal citations omitted).

 In this case, we believe that the clear error standard is appropriate, because the district court's application of U.S.S.G. § 3B1.1 to the facts of this case presents an issue that is predominantly factual rather than legal. Indeed, although the government asserts in its brief that "there is no dispute about the relevant facts" and therefore suggests that de novo review is appropriate, the government has basically devoted its argument to disagreeing—by reference to other evidence—with the district court's determination that Peter Gotti did not exercise a sufficient level of control over the enterprise to be deemed an organizer or leader of the enterprise.[19] Regardless of whether we would have reached the same decision

---

**19.** For example, although the district court found that there was "no evidence before the Court that Mr. Gotti exercised decision-making authority in the commission of these crimes," April 15, 2004 Sentencing Tr., the government argues in its brief that Peter Got-

ti's position as acting boss "entailed substantial control over the criminal activities of the Gambino family rank and file," including "supervis[ing] extortionate activity by the Gambino Family."

were *a de novo* standard to apply, we do not believe that the district court committed clear error here.

### B. Ciccone

Pursuant to *United States v. Fagans*, 406 F.3d 138 (2d Cir.2005), we vacate Ciccone's sentence and remand his case for resentencing.[20] We note that Ciccone has raised numerous arguments as to the district court's calculation of his Guidelines sentence, and that he also asserts that certain of these arguments similarly invalidate the restitution and forfeiture orders imposed against him. Rather than addressing those issues at this juncture, we believe that the more prudent course is to let the district court pass upon them in the first instance when resentencing Ciccone. *See, e.g., Fagans*, 406 F.3d at 141 & n. 2. Because these arguments are also the bases of some of his challenges to his restitution and forfeiture orders, the district court, if it is so inclined, may revisit those calculations as well.[21]

### C. Bondi

Bondi and the government are in agreement that Bondi, like Ciccone, is entitled to resentencing pursuant to *Fagans*. We therefore vacate Bondi's sentence and remand his case for resentencing.

### IV. CONCLUSION

We have considered all of the defendants-appellants' contentions on these appeals and have not found any basis for reversing their convictions. In light of the Supreme Court's decision in *Booker* and this Court's decisions in *Crosby* and *Fagans*, we remand Peter Gotti's sentence to the district court for consideration of whether to resentence pursuant to *Crosby*, and we remand Ciccone's and Bondi's sentences to the district court for resentencing pursuant to *Fagans*.

---

**20.** Ciccone's sentence is remanded pursuant to *Fagans* rather than *Crosby* because, as both Ciccone and the government agree, Ciccone (unlike Peter Gotti) objected, prior to sentencing, to the compulsory application of the Guidelines.

**21.** We do note, however, that to the extent Ciccone argues that the restitution and forfeiture orders violate the Sixth Amendment because they were based on factual findings made by the district court under a preponderance of the evidence standard, that argument has already been considered and rejected by this Circuit. *See United States v. Reifler*, 446 F.3d 65, 113–20 (2d Cir.2006) (holding that the Sixth Amendment right to a jury trial is inapplicable to restitution imposed under the Mandatory Victims Restitution Act); *Fruchter*, 411 F.3d at 380–83 (same, for forfeiture).